PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2189
_____

D. K., a minor, by and through his parents,
Stephen K. and Lisa K.;  STEPHEN K.; LISA K., adults,
individually and on their own behalf,

Appellants

v.

ABINGTON SCHOOL DISTRICT
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 08-cv-04914)
District Judge:  Honorable Cynthia M. Rufe
_____

Submitted Under Third Circuit LAR 34.1(a)
July 9, 2012

Before:  FUENTES, HARDIMAN
and ROTH, *Circuit Judges*.

(Filed:  October 11, 2012)

Michael E. Gehring
Dennis C. McAndrews
McAndrews Law Offices
30 Cassatt Avenue
Berwyn, PA 19312
        *Attorneys for Appellants*


Claudia L. Huot
Michael D. Kristofco
Wisler Pearlstine
460 Norristown Road
Suite 110
Blue Bell, PA 19422-0000
        *Attorneys for Appellee*

———————————

## OPINION OF THE COURT

———————————

HARDIMAN, *Circuit Judge*.

This case requires us to decide whether a public school district's failure to designate a struggling student as disabled violated the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1419, or § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. In making this determination, we delineate for the first time the scope of the statutory exceptions to the IDEA's statute of limitations.

I

A

In the fall of 2003, D.K. began attending kindergarten in a half-day program at Copper Beech Elementary in the Abington, Pennsylvania, School District (the School District). During that year, he struggled with reading and misbehaved regularly. According to the School District's psychologist, Dr. Suzanne Grim, and the Copper Beech principal, Dr. Jan Kline, D.K. failed to progress in several areas, including: following oral directions, listening to and acknowledging the contributions of others, exhibiting self-control, following rules, producing neat and legible work, completing class work in the time allotted, and using non-instructional time appropriately. At the same time, Dr. Grim stated that while some preschool and kindergarten students have difficulty following directions, it does not necessarily indicate a disorder. A conference form completed by D.K.'s kindergarten teacher indicated that D.K. exhibited "much growth." D.K. received "proficient," "basic," and "below basic" marks in various reading skills, and received one-on-one reading services from a specialist. At the conclusion of the year, the School District recommended that D.K. repeat kindergarten.

Although D.K.'s second year of kindergarten was a more intensive full-day program, he showed little maturation. In conference forms, D.K.'s teacher noted D.K.'s proficiency in reading and advanced scores in math, but she expressed concern about his behavior, his tendency to rush through classwork and turn in incomplete assignments, and his difficulty controlling himself, especially when he became upset. Indeed, D.K. threw temper tantrums and was "defiant" and "extremely argumentative." His teachers documented forty-three tantrums between March 14 and May 24, 2005.

In response, D.K.'s teachers implemented "behavior plans," including a sticker chart and a system using popsicle sticks, but they did not conduct a functional behavioral assessment. D.K.'s parents were optimistic about, and cooperative in, these behavioral improvement plans. In the meantime, D.K. was "doing very well academically," and, for the most part, "play[ing] well with others,". Nevertheless, at the end of the year, having witnessed little behavioral progress, D.K.'s parents and teachers shared a "major concern" about "how well [he] [would] handle a first grade classroom."

Within the first two months of D.K.'s first-grade year, his teacher convened a parent-teacher conference to discuss D.K.'s "listening/following directions and organizational weaknesses." D.K. had been copying another student's work, was unable to recall instructions, exhibited poor organizational and planning skills, misplaced his work, stuttered, and often lost his train of thought. To resolve these problems, the teacher recommended, among other things, measures D.K.'s parents could implement at home. The possibility of a formal evaluation was not discussed at that time.

At a second conference held the following month, D.K.'s parents learned that he continued to struggle in the classroom and was making obscene gestures towards his classmates. At a third conference following the issuance of D.K.'s first report card in December 2005, his teacher noted continuing behavioral challenges, explained that she was "providing as many supports as [she could] to aid" D.K., and opined that while "it was too soon to discuss testing (because he [was] not failing), that might be an option down the road." The teacher's notes reflect that D.K.'s parents saw "no significant problem" and attributed his behavior to "[D.K.] being [D.K.]".

4

In January 2006, D.K.'s poor social skills led the School District to place him in a special social skills group run by Dr. Grim. According to Dr. Grim, D.K. was "on par with" other students in the group.

That same month, D.K.'s parents requested an evaluation of D.K., and on April 24, 2006, the School District administered a cognitive ability test, which measures "innate ability," and a visual-motor integration test. Dr. Grim also administered a Wechsler Intelligence Scale for Children–Fourth Edition and a Wechsler Individual Achievement Test–Second Edition, and observed D.K. in the classroom setting. She prepared an Evaluation Report using the Behavior Assessment System for Children (BASC), specifically assessing whether D.K. suffered from Attention Deficit/Hyperactivity Disorder (ADHD). She concluded that D.K.'s various scores placed him in average and low-average ranges, and that D.K. was not in need of special education services. Based on the BASC ratings, which are completed by a student's parents and teachers, D.K. was not in an "at risk" or "clinically significant" range. His math and reading tests showed he was proficient in both. D.K.'s parents signed a Notice of Recommended Education Placement form approving the April 2006 evaluation results, and D.K. was promoted to second grade beginning in the fall of 2006.

Plaintiffs claim that despite extra help in math and reading—which consisted of 30 minutes and 180 minutes per week, respectively, —D.K. continued to struggle academically during second grade. The School District, on the other hand, contends that D.K. made "considerable progress." The record shows his grades improved compared with first grade, but he fought with other children on the playground and on the bus.

5

Around January 2007, D.K. began seeing private therapist Dr. Linn Cohen. At the end of March 2007, Dr. Cohen informed D.K.'s teachers and the School District that she was "[e]xtremely convinced" D.K. needed special placement. D.K.'s teachers discussed the results of the April 2006 testing with Dr. Cohen, who mentioned the possibility of re-testing D.K. At the end of the school year, D.K.'s father notified the school that outside testing had diagnosed D.K. with "auditory processing" and "sensory stimulation" problems.

Before D.K. began third grade, in July 2007, his parents formally requested a second, more comprehensive evaluation. Additionally, despite improvement in D.K.'s behavior and academic performance at the beginning of his third-grade year, in September 2007 D.K.'s parents obtained a private pediatric neurological evaluation from Dr. Peter R. Kollros. Dr. Kollros diagnosed D.K. with ADHD and opined that D.K.'s "learning would be enhanced if he were to have the usual kinds of school accommodations for children with ADHD, including if needed preferential seating, taking tests in an environment without unnecessary distractions, organization support, and possibly extra time for tests." Two months later, the School District's own second round of testing determined that D.K. was eligible for special education services as a student with "other health impairment," and he was offered an Individualized Education Program (IEP) on November 30, 2007.

B

On January 8, 2008, in the midst of finalizing D.K.'s IEP, his parents requested a due process hearing pursuant to the IDEA and requested an award of compensatory education for September 2004 through March 12, 2008, after D.K.'s IEP was

6

finalized and implemented.[1]  After four hearings, the state agency hearing officer denied Plaintiffs' claims.  The appeals panel found no abuse of discretion and affirmed the hearing officer's findings.  Having exhausted their administrative remedies, Plaintiffs sought review of those decisions in the District Court.[2]  *See* 20 U.S.C. § 1415(i)(2)(A).

The District Court affirmed the state agency in all

---

[1]  The IDEA requires states to provide parents "[a]n opportunity . . . to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6)(A); *accord Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525 (2007).  The parents later may "request an 'impartial due process hearing,' which must be conducted either by the local educational agency or by the state educational agency, and where a hearing officer will resolve issues raised in the complaint."  *Winkelman*, 550 U.S. at 525 (citations omitted) (citing 20 U.S.C. § 1415(f)(1)(A), (3)).  Pennsylvania state regulations provide that parents "may request an impartial due process hearing" if they "disagree with [a] school district's . . . identification, evaluation, or placement of, or the provision of a free appropriate public education to the student."  22 Pa. Code § 14.162(b).

[2]  Under the IDEA, a reviewing federal court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

respects. It concluded that the IDEA's statute of limitations, which was passed in 2004, barred Plaintiffs from seeking relief for any of the School District's conduct prior to January 8, 2006, (two years before Plaintiffs requested a due process hearing), *D.K. v. Abington Sch. Dist.*, No. 08-4914, 2010 WL 1223596, at *6 (E.D. Pa. Mar. 25, 2010), and that Plaintiffs were ineligible for two statutory exceptions to the IDEA statute of limitations, *id.* at *4–6. In concluding that the School District did not violate its obligation to identify students in need of special education, the District Court opined:

> [P]rior to receiving a diagnosis of ADHD and conducting its second evaluation, the [School] District had insufficient reason to believe that D.K. was a student with a mental impairment that substantially limited one or more of his major life activities. The Court agrees with the Hearing Officer's logic that one must take into account the fact that children develop cognitively and socially at different rates. In this instance, the problems experienced by D.K., which later triggered a second special education evaluation, were not so pronounced in his earlier development.

*Id.* at *7. The Court also rejected Plaintiffs' argument that the School District failed to provide D.K. a free appropriate public education (FAPE) before November 2007, when it designed an IEP for him. The Court found that D.K.'s behavior did not require the school to conduct a functional behavioral assessment as part of the April 2006 evaluation and that the testing

8

performed at that time was legally adequate.[3] *Id.* at \*8–9. Finally, the District Court denied Plaintiffs' request to introduce additional evidence, namely: (1) a report by Dr. Emily Perlis offering a *post hoc* analysis of the appropriateness of the School District's responses to D.K.'s behavioral problems during each of his school years; and (2) the Pennsylvania Department of Education Guidelines, which set forth non-binding best practices. *Id.* at \*10–11. Plaintiffs timely appealed, and we now consider the state agency and District Court decisions rejecting their claims.

## II

The District Court had jurisdiction pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331. We have jurisdiction over its final order under 28 U.S.C. § 1291.

In cases arising under the IDEA, we apply a "modified *de novo*" standard of review, "giv[ing] 'due weight' and deference to the findings in the administrative proceedings." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269–70 (3d Cir. 2003)). Like the District Court, we "must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ. v.*

---

[3] In the District Court, Plaintiffs also alleged that the IEP developed in November 2007 following D.K.'s second evaluation failed to provide a FAPE. *D.K.*, 2010 WL 1223596, at \*9–10. The District Court rejected that argument, *id.*, and Plaintiffs have abandoned it on appeal.

9

*P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citation, internal quotation marks, and emphasis omitted). "The statute of limitations claims and [Plaintiffs'] claims for compensatory education . . . are subject to plenary review as conclusions of law." *P.P.*, 585 F.3d at 735. But "whether [Plaintiffs] proved an exception to the [2004 IDEA] statute of limitations, and whether the [School] District fulfilled its FAPE obligations . . . are subject to clear error review as questions of fact." *Id.* (citing *S.H.*, 336 F.3d at 271). Such "'[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and if [we] do[] not adhere to those findings," we must "'explain why.'" *Id.* at 734 (quoting *S.H.*, 336 F.3d at 270). As the party seeking relief and the party challenging the administrative decisions, Plaintiffs bear the burden of persuasion on their IDEA and Rehabilitation Act claims. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012) (citing *Schaffer v. Weast*, 546 U.S. 49, 56 (2005)).

III

"The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *P.P.*, 585 F.3d at 735. Accordingly, schools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students. Plaintiffs contend that the School District neglected both duties by failing to identify D.K. as a disabled student based on his subpar behavioral and academic performances in kindergarten through third grade, by administering incomplete testing in April 2006 that was ill-suited to diagnose ADHD, and by offering inadequate support to D.K. before November 2007.

Because our analysis of the School District's obligations under the IDEA and § 504 of the Rehabilitation Act is circumscribed by the IDEA statute of limitations, *see P.P.*, 585 F.3d at 735–37, we begin by delimiting the time period to which D.K.'s claims apply.

A

The IDEA statute of limitations requires a parent to request a due process hearing within two years of "the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint."[4]   20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e).  Parents have the same two years to file an administrative complaint alleging a violation of the IDEA or § 504 of the Rehabilitation Act.  20 U.S.C. § 1415(b)(6)(B); 34 C.F.R. § 300.507(a)(2).  We have held that the IDEA statute of limitations applies to claims brought after it was passed in 2004, even if the conduct occurred before its passage.  *Steven I. v. Cent. Bucks Sch. Dist.*, 618 F.3d 411, 413–16 (3d Cir. 2010).  We have also held that the IDEA statute of limitations applies to § 504 claims premised on IDEA obligations, such as those invoking Child Find and FAPE duties. *P.P.*, 585 F.3d at 735–37.  Therefore, the IDEA statute of limitations applies to all of Plaintiffs' claims at issue in this appeal.

---

[4] The IDEA statute of limitations also permits parents to request a hearing "in such time as the State law allows," "if the State has an explicit time limitation for requesting such a hearing."  20 U.S.C. § 1415(f)(3)(C).  Pennsylvania has adopted the IDEA statute of limitations regulations in their entirety.  22 Pa. Code § 14.102(a)(2)(xxix)–(xxx).

Plaintiffs do not dispute that because they requested a due process hearing on January 8, 2008, the statute of limitations generally would limit their claims to the School District's conduct after January 8, 2006. Nevertheless, they seek refuge in two exceptions to the statute of limitations and, alternatively, equitable tolling doctrines.

The two exceptions upon which Plaintiffs rely state that the statute

> shall not apply . . . if the parent was prevented from requesting the hearing due to—
>
>> (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or
>>
>> (ii)   the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D)(i)–(ii); *accord* 34 C.F.R. § 300.511(f)(1)–(2). Invoking subsection (i), Plaintiffs argue that the School District misrepresented D.K.'s success by advising that his academic, behavioral, and social deficits could be addressed through individualized supports short of special education placement. Citing subsection (ii), Plaintiffs also assert that the School District did not provide them with a permission to evaluate form until January 5, 2006.

While district courts within the Third Circuit have interpreted the statute of limitations exceptions on several

12

occasions over the last few years, the scope of these exceptions is an issue of first impression for United States Courts of Appeals.

1

a

The first exception to the statute of limitations is set forth in § 1415(f)(3)(D)(i). As district courts have noted, "both statutory and regulatory guidance are lacking" regarding the contours of the "specific misrepresentations" referenced in that exception. *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 775 (M.D. Pa. 2012); *accord Evan H. ex rel. Kosta H. v. Unionville-Chadds Ford Sch. Dist.*, No. 07-4990, 2008 WL 4791634, at *6 (E.D. Pa. Nov. 4, 2008). Accordingly, we begin our analysis with the scope and meaning of subsection (i). In crafting the implementing regulations, *see* 34 C.F.R. § 300.511(f)(1), regulators did "not believe it . . . appropriate to define or clarify the meaning of 'misrepresentations,' as requested by the commenters[, stressing that] [s]uch matters are within the purview of the hearing officer." 71 Fed. Reg. 46,540, 46,706 (Aug. 14, 2006). Therefore, while we must delineate the meaning of this exception so we can review decisions of hearing officers and appeals panels, we reiterate that significant deference is owed to their applications of both exceptions and that we review them for clear error. *See P.P.*, 585 F.3d at 735.

Several district courts and administrative adjudicators have interpreted the meaning of "specific misrepresentation" in § 1415(f)(3)(D)(i). According to the Pennsylvania appeals panel, the majority view is that in order for the exception to

13

apply, "the alleged misrepresentation . . . must be intentional or flagrant rather than merely a repetition of an aspect of the FAPE determination." *In re Educ. Assignment of C.C.*, Spec. Ed. Op. No. 1866, at 10 & n.64 (Mar. 5, 2008) (citing cases). Several district courts have reached the same conclusion. *See I.H.*, 842 F. Supp. 2d at 775 ("'[A]t the very least, a misrepresentation must be intentional in order to satisfy [this exception].'" (second alteration in original) (quoting *Evan H.*, 2008 WL 4791634, at *6)); *Sch. Dist. of Phila. v. Deborah A.*, No. 08-2924, 2009 WL 778321, at *4 (E.D. Pa. Mar. 24, 2009); *Evan H.*, 2008 WL 4791634, at *6 ("[T]o show a 'specific misrepresentation,' Plaintiffs must establish not that the [school's] evaluations of the student's eligibility under IDEA were objectively incorrect, but instead that the [school] subjectively determined that the student was eligible for services under IDEA but intentionally misrepresented this fact to the parents."). *But see J.L. ex rel. J.L. v. Ambridge Area Sch. Dist.*, No. 06-1652, 2009 WL 1119608, at *11–12 (W.D. Pa. Apr. 27, 2009) (finding negligent misrepresentation sufficient), *abrogated on other grounds by Steven I.*, 618 F.3d 411.

We agree that the high threshold articulated by the district courts reflects a proper interpretation of subsection (i). In the absence of a showing of "misrepresentation" akin to intent, deceit, or egregious misstatement, any plaintiff whose teachers first recommended behavioral programs or instructional steps short of formal special education might invoke the exception. Mere optimism in reports of a student's progress would toll the statute of limitations. The allegations comprising a claim that a FAPE was denied or that Child Find obligations were not met would nearly always suffice to extend the timeframe beyond that dictated by the statute of limitations. *See I.H.*, 842 F. Supp. 2d at 775 ("We decline to hold . . . that action

14

which constitutes the basis for the IDEA claim itself can, absent more, satisfy the exception to the statute of limitations; doing so would allow the exception to become the rule, and the limitations period would be all but eliminated."); *Deborah A.*, 2009 WL 778321, at *4; *Evan H.*, 2008 WL 4791634, at *6 n.3 ("Plaintiffs would have the Court read 'misrepresentation' to include any occasion in which the actions of a local educational agency have failed to remedy an educational problem encountered by a student. Such an exception would swallow the rule established by the limitation period."). This cannot be the intent of the regulation. Rather, we conclude that a rule demanding at least a school's *knowledge* that its representations of a student's progress or disability are untrue or inconsistent with the school's own assessments best comports with the language and intent of the provisions. Therefore, we hold that in order to be excused from the statute of limitations based on § 1415(f)(3)(D)(i) because the school "specific[ally] misrepresent[ed] . . . that it had resolved the problem," plaintiffs must show that the school intentionally misled them or knowingly deceived them regarding their child's progress.

Unlike subsection (i), the language of the second exception at § 1415(f)(3)(D)(ii)—"withholding of information from the parent that was required under this subchapter to be provided to the parent"—requires little elaboration. The text of subsection (ii) plainly indicates that only the failure to supply *statutorily mandated* disclosures can toll the statute of limitations. In other words, plaintiffs can satisfy this exception only by showing that the school failed to provide them with a written notice, explanation, or form specifically required by the IDEA statutes and regulations. District courts in this Circuit have properly limited this exception to such circumstances. *See I.H.*, 842 F. Supp. 2d at 775; *Deborah A.*, 2009 WL 778321, at

15

*5; *Evan H.*, 2008 WL 4791634, at *7; *see also Evan H.*, 2008 WL 4791634, at *7 (concluding that subsection (ii) "refers solely to the withholding of information regarding the procedural safeguards available to a parent," including "'filing a complaint and requesting an impartial due process hearing'" (quoting *D.G. v. Somerset Hills Sch. Dist.*, 559 F. Supp. 2d 484, 492 (D.N.J. 2008))); *D.G.*, 559 F. Supp. 2d at 490, 492 (applying the exception where the school failed to provide parents who had repeatedly requested a special-education evaluation with either "written notice explaining why [it] refused to evaluate" the student or a procedural safeguards notice, both of which are required by 20 U.S.C. § 1415(b)(3)(B) and (c)(1)(A)–(C) when a school refuses to evaluate or change a student's educational placement).

Having analyzed subsections (i) and (ii) of § 1415(f)(3)(D), the clause that introduces those subsections—"if the parent was prevented from requesting the hearing due to"—merits discussion. This language imposes an additional requirement for invoking either of the two exceptions to the statute of limitations. Establishing evidence of specific misrepresentations or withholding of information is insufficient to invoke the exceptions; a plaintiff must also show that the misrepresentations or withholding *caused* her failure to request a hearing or file a complaint on time. The terms "prevented from" and "due to" denote a causation requirement. Thus, where the evidence shows, for example, that parents were already fully aware of their procedural options, they cannot excuse a late filing by pointing to the school's failure to formally notify them of those safeguards.

b

16

Applying these standards to D.K.'s case, we find no clear error in the administrative findings below that Plaintiffs failed to prove the applicability of the exceptions to the IDEA statute of limitations.

As to subsection (i), neither the School District nor its individual teachers intentionally or knowingly misled Plaintiffs regarding the extent of D.K.'s academic and behavioral issues or the efficacy of the solutions and programs they attempted. Throughout the relevant school years, D.K.'s teachers held numerous conferences with his parents at which they described, often in detail, his misconduct, frustration, challenges, and development. The majority of these conferences were specifically aimed to notify his parents of his poor performance. The School District proposed solutions, but it did not imply, let alone state with any confidence, that these measures would succeed or eliminate the eventual need for an evaluation. Individualized behavioral plans did yield some improvement, and the School District accurately reported those results to D.K.'s parents. Notably, neither the conference forms nor the remainder of the record in this case suggest that the School District represented that these minor improvements resolved D.K.'s behavioral challenges or obviated the need for monitoring and parent-teacher cooperation, *i.e.* "resolved the problem forming the basis of the complaint," § 1415(f)(3)(D)(i). Moreover, teachers sought parental permission and input at every step. When one of D.K.'s teachers suggested in 2005 that testing was not yet necessary, she cautioned that a more formal evaluation might be beneficial down the road. Thus, the School District's statements to D.K.'s parents fall well short of the sort of intentional or knowing misrepresentation required to toll the statute of limitations under § 1415(f)(3)(D)(i).

17

With respect to subsection (ii), Plaintiffs claim the School District provided them with neither a permission to evaluate form nor a procedural safeguards notification until after they requested an evaluation of D.K. in January 2006. But the School District was not obligated to do so in these circumstances. Procedural safeguard notices must be provided only when: (1) the student is referred for, or the parents request, an evaluation; (2) the parents file a complaint; or (3) the parents specifically request the forms. *See id.* § 1415(d); *see also* 22 Pa. Code § 14.123(c) (requiring schools to keep permission to evaluate forms available, but mandating that schools provide a copy only when parents orally request an evaluation).

As for the permission to evaluate form, Plaintiffs' argument that the School District should have notified them of the availability of an evaluation pursuant to 34 C.F.R. § 300.304 also fails. While the school "must provide notice . . . that describes any evaluation procedures the agency *proposes* to conduct," 34 C.F.R. § 300.304(a) (emphasis added); *accord id.* § 300.503, the regulations do not demand that the school preemptively advise parents of their right to have their child evaluated.[5] Even if the regulations did require such anticipatory

---

[5] Citing *Centennial School District v. S.D. ex rel. Daniel D.*, No. 10-4129, 2011 WL 6117278, at *6 (E.D. Pa. Dec. 8, 2011), Plaintiffs assert that their expressions of concern regarding D.K.'s academic and behavioral progress amounted to a request for an evaluation, triggering the School District's duty to provide them with a procedural safeguards notice and a permission to evaluate form. We disagree with that reasoning from *S.D.* because we cannot conclude that general expressions of concern constitute a "parental *request* for evaluation" under the plain terms of the statute. 20 U.S.C. § 1415(d)(1)(A)(i)

18

notice, Plaintiffs have not established causation; D.K.'s parents were not "prevented from requesting the hearing" by any such omission. Their own unprompted request for an evaluation in January 2006 demonstrates that they were aware of their right to seek one. Additionally, in December 2005, although the School District encouraged postponing a formal evaluation, it made D.K.'s parents aware of that option by noting that it might be an appropriate step down the road.

2

Plaintiffs argue in the alternative that two common law equitable tolling doctrines should apply: (1) "minority tolling," which applies to plaintiffs who were minors when their claims accrued; and (2) tolling because the School District prevented Plaintiffs from learning of the basis for their claims. We disagree. Although the statute is silent on the matter, legislative intent and the doctrine of *exclusio unius* preclude application of common law equitable tolling principles to save claims otherwise foreclosed by the IDEA statute of limitations. First, the legislative and regulatory history of the 2004 amendments to the IDEA makes clear that only the enumerated statutory exceptions may exempt a plaintiff from having his claims time-barred by the statute of limitations. *See* S. Rep. No. 108-185, at 40 (2003) ("The committee does not intend that common law determinations of statutes of limitations override this specific

(emphasis added); *see also* 22 Pa. Code § 14.123(c) ("Parents may request an evaluation at any time, and the request must be in writing. . . . If a request is made orally to any professional employee or administrator of the school entity, that individual shall provide a copy of the permission to evaluate form to the parents within 10-calendar [sic] days of the oral request.").

directive . . . ."); 71 Fed. Reg. 46,540, 46,697 (Aug. 14, 2006) ("It is not necessary to clarify that common-law directives regarding statutes of limitations should not override the Act or State regulatory timelines, as the commenters recommended, because the Act and these regulations prescribe specific limitation periods which supersede common law directives in this regard."). Second, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980).

Accordingly, IDEA plaintiffs cannot escape its statute of limitations by invoking equitable tolling doctrines recognized under state law. They can argue only for the application of one of the statutory exceptions, as the district courts have correctly held. *See Evan H.*, 2008 WL 4791634, at *5 (concluding that the IDEA statute of limitations "is not subject to the continuing violation or equitable tolling doctrines, but . . . instead, . . . can be extended only for one of the enumerated statutory exceptions"); *J.L. ex rel. J.L. v. Ambridge Area Sch. Dist.*, 622 F. Supp. 2d 257, 269 (W.D. Pa. 2008) ("The Court agrees . . . that the Regulations firmly establish that the two exceptions specifically set forth in the statute are the exclusive exceptions to the statute of limitations . . . .").

In sum, because D.K.'s parents are ineligible for the statutory exceptions and because common law equitable tolling doctrines do not apply, their claims are limited to violations after January 8, 2006.

B

20

We next consider the merits of Plaintiffs' claim that they are entitled to the equitable remedy of compensatory education because the School District failed to identify D.K. as disabled and to provide him a FAPE. "'A disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education.'" *P.P.*, 585 F.3d at 739 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007)). When a school fails to correct a situation in which a disabled student "is not receiving more than a *de minimis* educational benefit," the "child is entitled to compensatory education for a period equal to the period of deprivation, excluding only the time reasonably required for the school district to rectify the problem." *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 391–92 (3d Cir. 1996). "Obviously the case against [a] school district will be stronger if the district actually knew of the educational deficiency or the parents had complained," but where a school *should* have known if it had complied with its statutory duties, a compensatory-education remedy still may be appropriate. *Id.* at 397.

The remedy of compensatory education is available only where a student's substantive rights are affected by a school district's non-compliance with the IDEA. "Accordingly, '[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits.'" *M.R.*, 680 F.3d at 274 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010)).

"School districts have a continuing obligation under the IDEA and § 504"—called "Child Find"—"to identify and

21

evaluate all students who are *reasonably suspected* of having a disability under the statutes." *P.P.*, 585 F.3d at 738 (emphasis added); *accord* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111. A school's failure to comply with Child Find may constitute a procedural violation of the IDEA. *E.g.*, *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010) (calling the Child Find requirement a "procedural regulation[]"); *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (characterizing noncompliance with Child Find as a procedural violation).

Child Find extends to children "who are suspected of [having] . . . a disability . . . and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1); *accord L.M.*, 478 F.3d at 313; *Taylor v. Altoona Area Sch. Dist.*, 737 F. Supp. 2d 474, 484 (W.D. Pa. 2010). As several courts have recognized, however, Child Find does not demand that schools conduct a formal evaluation of every struggling student. *See, e.g.*, *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 661 (S.D.N.Y. 2011) ("The IDEA's child find provisions do not require district courts to evaluate as potentially 'disabled' any child who is having academic difficulties."). A school's failure to diagnose a disability at the earliest possible moment is not *per se* actionable, in part because some disabilities "are notoriously difficult to diagnose and even experts disagree about whether [some] should be considered a disability at all." *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 226 (D. Conn. 2008).

Plaintiffs claim that the School District violated its Child Find duties in three ways: (1) by failing to evaluate D.K. within a reasonable time after it should reasonably have suspected a

22

disability; (2) by conducting an inappropriate evaluation in April 2006; and (3) by failing to suspect disability when D.K.'s struggles continued after April 2006.

We have "'infer[red] a requirement that [schools identify disabled children] within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability.'" *M.R.*, 680 F.3d at 271 (quoting *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791 (3d Cir. 2007)). This requirement "is implicit in the 'child find' duty." *W.B.*, 67 F.3d at 501 (holding that a jury could reasonably find a violation of Child Find where a school failed to conduct an evaluation within six months after the personal observations of teachers and the receipt of information from parents provided notice of the student's likely disability). Accordingly, such a delay can constitute a procedural Child Find violation.

Moreover, a poorly designed and ineffective round of testing does not satisfy a school's Child Find obligations. *See, e.g.*, *G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 465–67 (E.D. Pa. 2011) (finding that the school's reevaluation of an elementary school student with significant behavioral problems was inadequate because it overemphasized the student's academic proficiency and assessed behavioral issues only cursorily). The IDEA requires that initial evaluations upon suspicion of a disability

> (A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent . . . [;]

23

(B) not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child; and

(C) use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

20 U.S.C. § 1414(b)(2)(A)–(C); 34 C.F.R. § 300.304(b)(1)–(3). It further mandates, among other things, that evaluation materials be "used for purposes for which the assessments or measures are valid and reliable" and that children be "assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(A)(iii), (B); 34 C.F.R. § 300.304(c)(1)(iii), (4). But while an evaluation should be tailored to the specific problems a potentially disabled student is having, it need not be designed to identify and diagnose every possible disability. *See P.P.*, 585 F.3d at 738–39 (rejecting the parents' argument that an evaluation report was deficient because it failed to identify a math disability and did not test for social and emotional functioning, reasoning that "those areas were not identified as suspected disabilities and so were properly excluded" from the screening).

We agree with the decisions below that Plaintiffs have failed to establish an unwarranted delay,[6] a deficient April 2006

---

[6] Although more than sixty days elapsed between the date on which Plaintiffs returned the permission to evaluate form to the School District, February 11, 2006, and the evaluation on April 26, 2006, *see* 20 U.S.C. § 1414(a)(1)(C)(i)(I) (giving

24

evaluation, or evidence showing the School District should reasonably have suspected D.K. was disabled and in need of special education services after April 2006.

The School District was not required to jump to the conclusion that D.K.'s misbehavior denoted a disability or disorder because hyperactivity, difficulty following instructions, and tantrums are not atypical during early primary school years. *See L.M.*, 478 F.3d at 314 (finding no violation where witnesses testified that the student's "difficulties would not necessarily indicate a disability or a need for special education, and that it would be inappropriate to rush to identify a child that young as disabled"); *id.* (noting that "[s]chool personnel . . . testified that [the student's] behavioral and learning problems were not atypical of immature young boys"); *see also Scarsdale Union*, 826 F. Supp. 2d at 662–63 (finding no Child Find violation where a high school junior's absences and difficulty keeping up with assignments were "not unusual among first-semester juniors . . . [and] five or six other kids were having similar problems at the time"). Moreover, D.K.'s report cards and conference forms indicated intermittent progress and even academic success in several areas. *Cf. L.M.*, 478 F.3d at 311

---

schools sixty days to conduct an evaluation after receipt of the parents' form), this mere procedural noncompliance is insufficient to merit compensatory-education relief unless it also resulted in the substantive denial of a FAPE. *See M.R.*, 680 F.3d at 273; *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66–67 (3d Cir. 2010). As we explain *infra*, we find no such substantive failure by the School District. Separately, to the extent Plaintiffs claim the School District violated Child Find by failing to test D.K. before January 2006, their claim is barred by the statute of limitations.

(finding no violation where a student was "meeting expectations" in academic areas despite struggling with social and behavioral problems throughout elementary school).

Nor do we find error in the conclusions that the April 2006 battery of tests was adequate under Child Find. Plaintiffs contend, among other things, that the School District's failure to use a functional behavioral assessment rendered the testing legally inadequate. But the IDEA and its implementing regulations do not require that a school use a functional behavioral assessment when initially testing students for suspected disabilities.[7] The four tests the School District did employ covered discrepant skill sets and probed for indicia of varying disabilities. The mere fact that a subsequent evaluation of D.K. yielded a different result—*i.e.* he was found disabled with an "other health impairment" in November 2007 but did not qualify in April 2006—does not necessarily render the earlier testing inadequate. *Cf. M.R.*, 680 F.3d at 264–66 (finding no Child Find violation where a school's February 2007 evaluation concluded that a student did not have a learning disability but its February 2008 testing found reading, math, reasoning, and writing disabilities). Therefore, we will not

---

[7] The IDEA's only mention of the functional behavioral assessment method is in § 1415(k)(1)(D), which requires use of that technique when a disabled student, who is already being educated pursuant to an IEP, continues to exhibit behavioral problems. This neither precludes nor requires use of a functional behavioral assessment in initial disability evaluations. As with all evaluations, the component testing mechanisms must be determined on a case-by-case basis depending on the suspected disability and the student's needs. *See* 20 U.S.C. § 1414(b)(2)(A)–(C); 34 C.F.R. § 300.304(b)(1)–(3).

second-guess the findings of the state agency or the District Court on this question. *D.K.*, 2010 WL 1223596, at \*7–9.

We are also unpersuaded that the School District violated its Child Find obligations by failing to suspect D.K. of a disability after the April 2006 evaluation based on further misconduct and additional opinions by his parents and private therapist. *See M.R.*, 680 F.3d at 273 ("When a school district has conducted a comprehensive evaluation and concluded that a student does not qualify as disabled under the IDEA, the school district must be afforded a reasonable time to monitor the student's progress before exploring whether further evaluation is required. . . . The IDEA does not require a reevaluation every time a student posts a poor grade."). Plaintiffs' argument in this respect is belied by the record and inconsistent with the findings of the state agency below. D.K. exhibited improvement after his April 2006 evaluation, and his continuing misbehavior was typical of boys his age. D.K.'s parents consistently approved and cooperated with the behavioral plans devised by his teachers. Moreover, when Dr. Cohen opined in May 2007 that D.K. required special education, teachers discussed with her the results of the April 2006 evaluation. The record does not disclose that she further pressed for formal accommodations.

Finally, the measures the School District did take to assist D.K. in the classroom militate against finding a Child Find violation. His teachers did not neglect his difficulties. Far from it, they and other Copper Beech faculty took proactive steps to afford him extra assistance and worked closely with his parents to maximize his potential for improvement. It would be wrong to conclude that the School District failed to identify D.K. as a challenged student when it offered him substantial accommodations, special instructions, additional time to

27

complete assignments, and one-on-one and specialist attention en route to eventually finding a disability. *Cf. M.R.*, 680 F.3d at 272 (agreeing with a hearing officer's decision that no Child Find violation occurred where the school district's investment in "addressing [a student's] needs and providing appropriate instruction and interventions before rushing to special education identification" was apparent).

In sum, schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities, especially at a time when young children are developing at different speeds and acclimating to the school environment. Moreover, neither the failure to employ a functional behavioral assessment nor a subsequent disability finding is *per se* indicative of an inappropriate evaluation. The School District did not breach its Child Find duty by failing to test D.K. until April 2006, during his first-grade year, or by declining to label him disabled under the IDEA until his second-grade year.

Plaintiffs' claim for compensatory education is further foreclosed because the hearing officer, appeals panel, and District Court correctly determined that D.K. was not denied a FAPE. D.K. demonstrated academic progress in math and reading as he progressed from grade to grade. During the 2004–2005 school year, his teachers noted that he possessed advanced math skills, and between 2003 and 2006, he received numerous "proficient" and "advanced" marks in reading, social studies, health and safety, math, music, art, and physical education. When D.K. became frustrated with reading and communication skills, the School District provided him with one-on-one tutoring and gave him additional time to complete tests. To address his below-average social development, D.K.'s teachers designed

individualized systems, which yielded some progress. *See L.M.*, 478 F.3d at 314 (finding that the school provided a FAPE where, although it had not identified the student as IDEA-eligible, its individualized "interventions . . . were moderately successful" and supplied extra assistance necessary for a meaningful education); *see also M.C.*, 81 F.3d at 395–96 (denying compensatory education where the school believed in good faith that it was providing an appropriate education, noting that "[a] difference of opinion as to the adequacy of an educational program is not equivalent to a complete and total failure to provide a child with an education"). Indeed, these are precisely the types of special measures D.K.'s neurologist recommended after diagnosing him with ADHD. Therefore, we conclude that D.K. received a FAPE and is not entitled to a compensatory education award.[8] *See P.P.*, 585 F.3d at 739.

---

[8] Our analysis and conclusion in this respect govern not only Plaintiffs' IDEA claims, but also their arguments premised on § 504 of the Rehabilitation Act. Section 504 mandates that "'[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination' under any program that receives federal funds." *M.R.*, 680 F.3d at 280 (alteration in original) (quoting 29 U.S.C. § 794(a)). "As we have explained, § 504's 'negative prohibition' is similar to the IDEA's 'affirmative duty' and . . . requires schools that receive federal financial assistance to 'provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" *Id.* (quoting *W.B.*, 67 F.3d at 492–93). As under the IDEA, providing a FAPE in accordance with § 504 requires a school district to "reasonably accommodate the needs of the

C

Plaintiffs lastly argue that the District Court erred by excluding the expert report of Dr. Emily Perlis and the Pennsylvania Department of Education Guidelines, both of which Plaintiffs offered for the first time in the District Court. A district court reviewing administrative IDEA decisions "shall hear additional evidence at the request of a party," 20 U.S.C. § 1415(i)(2)(C)(ii), but "the question of what additional evidence to admit in an IDEA judicial review proceeding . . . should be left to the discretion of the trial court," *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995). As the District Court reasoned, all a court must do is "consider the party's request to admit additional evidence" and "not summarily reject" it. *D.K.*, 2010 WL 1223596, at *4. The district court should not automatically "'disallow testimony from all who did, or could have, testified before the administrative hearing,'" *Susan N.*, 70 F.3d at 759–60 (quoting *Burlington v. Dep't of Educ. for Mass.*, 736 F.2d 773, 790–91 (1st Cir. 1984)), but the court need not consider evidence that is irrelevant or cumulative, *see id.* at 760.

First, as the District Court found, the Perlis report is largely duplicative of the evidence given at the administrative hearings. Six of the report's nine pages—a summary of D.K.'s early education—were already introduced as exhibits and discussed by witnesses before the hearing officer. Moreover,

handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Id.* Consequently, our finding that the School District did not deny D.K. a FAPE is equally dispositive of Plaintiffs' § 504 claim.

her report offers only a commentary, prepared with the benefit of hindsight, regarding the evidence and testimony already presented to the state agency.

Second, contrary to Plaintiffs' assertions that the Pennsylvania Department of Education Guidelines should have been admitted because they set forth "necessary components" of behavioral support strategies that the School District failed to incorporate, the Guidelines offer only non-binding best practices. *Holmes v. Milcreek Twp. Sch. Dist.*, 205 F.3d 583, 591 (3d Cir. 2000). The School District's failure to adhere to those Guidelines does not amount to the denial of a FAPE, so they are of only minor relevance at best. Therefore, we will uphold the District Court's discretionary determination to exclude Plaintiffs' tardy evidence.

IV

In sum, we conclude that Plaintiffs' claims are limited to the two-year time period between January 8, 2006, and January 8, 2008. Having interpreted the IDEA statute of limitations exceptions as requiring either intentional or knowing misrepresentation of D.K.'s problems and progress or the withholding of information expressly required by the IDEA statutes and regulations to be disclosed to parents, we hold that neither the District Court nor the state agency clearly erred when it found Plaintiffs ineligible for the exceptions. Nor may Plaintiffs invoke common law equitable tolling doctrines in the face of specifically enumerated exceptions in the governing federal statute.

We further hold that during the relevant portion of D.K.'s education at Copper Beech Elementary, the School District

31

consistently monitored, documented, and responded to his individual educational needs. The School District developed behavioral improvement systems with his parents' cooperation and offered him special attention and testing accommodations. Under these circumstances, we find no Child Find or FAPE violation justifying an award of compensatory education. Accordingly, we will affirm the judgment of the District Court.