**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4450
_____

K. K., a minor by her parents;
L. K. and;
T. G., and on their own behalf

v.

Pittsburgh Public Schools

K.K.,
Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-12-cv-01603)
District Judge: Honorable Arthur J. Schwab
_____

Argued July 9, 2014
_____

Before: SMITH, VANASKIE, and SLOVITER, *Circuit Judges*

(Opinion Filed: September 22, 2014)

Jeffrey J. Ruder, Esq. [ARGUED]
Suite 450
429 Forbes Ave
Pittsburgh, PA 15219
    *Counsel for Appellant*

Ira Weiss, Esq.
Aimee R. Zundel, Esq. [ARGUED]
Weiss Burkardt Kramer
445 Fort Pitt Boulevard
Suite 503
Pittsburgh, PA 15219
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge*.

Appellant K.K. sued the Pittsburgh Public Schools District (the District), alleging violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Chapter 15 of the Pennsylvania Code, 22 Pa. Code § 15.  Specifically, K.K. alleged that during and in the aftermath of a period of disability-related homebound instruction, the District failed to provide her with an education commensurate with her abilities as a gifted student.  K.K. sought compensatory damages, as well as declaratory, injunctive, and equitable relief.  The District Court, finding no evidence that the District acted with deliberate indifference to K.K.'s federally protected rights or otherwise discriminated against her, granted summary judgment in favor of the District.  Because we likewise conclude that there is no genuine dispute as to any material fact, and the District is entitled to judgment as a matter of law on all counts, we will affirm the District Court's order granting summary judgment in favor of the District.

2

I.

From ninth to twelfth grade, K.K. attended Allderdice High School, located within the Pittsburgh Public Schools District. There, she participated in the school's Center for Advanced Studies (CAS), which offered rigorous coursework in advanced subjects for gifted students. In February 2009, during K.K.'s junior year, she was diagnosed with gastroparesis, a condition requiring intermittent hospitalization that left K.K. temporarily unable to attend class. For the remainder of the school year, consistent with a local policy adopted pursuant to Pennsylvania law, the District provided K.K. with "homebound instruction" consisting of two-and-a-half hours of one-on-one lessons with a qualified instructor per week.[1] At their own expense, K.K.'s parents opted to supplement that instruction with private tutoring. K.K. successfully completed all of her eleventh grade coursework on schedule except for her Chemistry and Japanese courses, which she completed belatedly during the following year.

K.K. began her senior year in September 2009 generally symptom-free. She self-selected a course load considered difficult even by CAS standards, which included so many elective courses that she was left without a lunch period. After K.K.'s CAS advisor

---

[1] During periods of excused nonattendance, Pennsylvania schools may provide students with temporary homebound instruction, pursuant to which "the student may be counted for attendance purposes as if in school." 22 Pa. Code § 11.25(b). The policies governing both excused nonattendance and homebound instruction are left to the discretion of the school districts. *Id.* § 11.25(a), (c).

and her academic counselor met with K.K. and her parents to express their concerns, K.K. agreed to drop two elective courses and take a less challenging calculus course.

Within weeks after returning to school, K.K. suffered a relapse of her gastroparesis. Her parents, hoping that K.K.'s absence from school would be brief, notified the District of the situation but declined to immediately reinstate homebound instruction. By October 28, however, after it had become clear that K.K.'s absence would be longer than initially expected, K.K.'s parents met with District personnel and agreed to implement homebound instruction once again.

On November 10, the District formally identified K.K. as a qualified student with a disability under § 504 of the Rehabilitation Act and assembled a team to form a "Section 504 Plan," also known as a "Service Agreement," tailored to her needs. The initial Plan, which was distributed to K.K.'s teachers, included four provisions: (1) K.K. would receive homebound instruction through December 1, 2009, with renewals as necessary; (2) K.K. would be permitted to attend school whenever her health allowed; (3) K.K. would be given 50% extended time on assignments; and (4) while in school, K.K. would have access to the nurse's office or the CAS office in the event of a medical emergency.

On December 14, 2009, through counsel, K.K.'s parents notified the District that in addition to gastroparesis, K.K. had been diagnosed by a psychologist with an anxiety disorder. They also voiced serious reservations about the effectiveness of the District's homebound instruction policy. Specifically, the District-appointed homebound instructor

4

had proved unable to personally provide direct substantive guidance in all of K.K.'s courses—which, as noted earlier, included advanced-placement work in English, Japanese, Chinese, calculus, physics, European history, and biology. As a result, K.K. dropped two of those courses and attempted to self-teach others, or completed them only with the help of a private tutor.

In response, the District provided K.K.'s parents with a "Permission to Evaluate" form to assess K.K.'s potential entitlements under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482. For reasons unknown, K.K.'s parents did not grant permission for K.K. to be evaluated. On January 13, 2010, District staff met with counsel for K.K.'s parents to revise her Section 504 Plan. The resulting Plan contained significantly more permissive accommodations: (1) homebound instruction until January 31, 2010; (2) no attendance-related penalty for medical absences; (3) permission to eat and drink at school throughout the day; (4) permission to enter and exit the school as needed; (5) permission to proceed directly to the first class period without attending homeroom; (6) modification of schedule to allow for direct instruction and free periods; (7) a guarantee of at least one class period per week of direct instruction from a qualified instructor in English, Calculus, Japanese, Chinese, and Physics; (8) assignment to a particular study hall; (9) allowances for non-duplicative make-up work; and (10) no penalty on tests or assignments relating to information or concepts not previously taught. The Plan also stipulated that if K.K. had another medical relapse, the District would assign a single point of contact responsible for coordinating make-up assignments,

corresponding with K.K.'s parents, arranging homebound instruction, and collecting materials for K.K.'s coursework.

On January 14, 2010, K.K. met with Allderdice's in-school social worker to discuss available mental health resources. The social worker advised K.K. of certain student-assistance programs, as well as the services of the District's mental health liaison. K.K. declined those offers, and K.K.'s parents did not complete a release form which would have allowed the District to coordinate K.K.'s treatment with her psychologist.

On January 22, 2010, K.K. received a good report from her psychologist and was free of physical symptoms related to her gastroparesis. She returned to school in early February with several further accommodations in place, including reduced coursework, permission to use notes and study guides on closed-book exams, permission to take written exams orally, and significant time extensions on assignments. Nonetheless, K.K. soon fell further behind her classmates with respect to progress in her still-demanding schedule.

At some point prior to April 2010, K.K. began to retreat for portions of the day to the school's library, where she misled the attendants into believing that she was permitted to do so under the liberal provisions of her second Section 504 Plan. School officials, who demonstrated considerable confusion as to who was responsible for monitoring K.K.'s progress under the Plan, did not recognize that K.K.'s in-class attendance had plummeted until April 6. District staff sent a letter to counsel for K.K.'s parents expressing concern at K.K.'s number of absences. On April 21, K.K. and her parents met

6

with District staff to discuss the problem. In response, K.K.'s teachers created a schedule of remaining assignments with a reduced workload and indicated that they would contact K.K.'s parents in the case of future absences. Despite that intervention, K.K. continued to retreat to the library. On May 19, K.K.'s parents notified the District that K.K. had suffered another prolonged relapse and would finish her studies at home with the assistance of private tutoring.

In June 2010, K.K. graduated with a class rank of 21st out of 336 students. She was accepted into and matriculated at a well-known university that fall. In college, however, K.K.'s anxiety disorder persisted, and she finished her first year on academic probation—a result that K.K. attributes in large part to what she considered the substandard quality of instruction provided by the District during her senior year of high school. She withdrew on a medical leave during her second year and returned to Pittsburgh.

On November 21, 2011, K.K.'s parents filed an administrative due process complaint with the Pennsylvania Office for Dispute Resolution. After several days of hearings in April and June 2012, during which K.K. presented expert testimony, a Special Education Hearing Officer found in favor of the District. The Hearing Officer determined that although the District had been "careless in many regards," the "record in its entirety [did] not support a finding that the District acted with deliberate indifference." (App. 31.) The Hearing Officer further found that the record did not support a finding of denial of a free appropriate public education under IDEA.

7

On November 4, 2012, K.K. and her parents filed an appeal and original action in the United States District Court for the Western District of Pennsylvania. Count I of the complaint alleges that the District violated § 504 of the Rehabilitation Act and Chapter 15 of the Pennsylvania Code by maintaining policies which prohibited schools from increasing the amount of weekly homebound instruction beyond two and a half hours and from selecting qualified instructors to provide instruction in each subject. Count II alleges that the District violated § 504 by failing to provide sufficient homebound instruction and supervise the administration of K.K.'s Section 504 Plan. Count II also asserts that the District was deliberately indifferent to the violation of K.K.'s federally protected rights.

On October 16, 2013, the District Court denied K.K.'s motion for summary judgment and granted the District's cross-motion for summary judgment.[2] Although the District Court recognized the "isolated failures" of the District, it ultimately concluded that the record did not contain evidence that would permit a jury to find the District in violation of § 504 and Chapter 15 of the Pennsylvania Code. K.K. filed a timely notice of appeal.

II.

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's order granting summary

_____

[2] Earlier, on May 22, 2013, the District Court granted the District's motion to terminate K.K.'s parents as parties to the case.

judgment is plenary. *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 134 (3d Cir. 2013). A grant of summary judgment is appropriate where the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence "'in the light most favorable to the nonmoving party.'" *Trinity Indus., Inc.*, 735 F.3d at 134–35 (quoting *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010)).

III.

The Rehabilitation Act of 1973, 29 U.S.C. §§ 701–97, prohibits discrimination on the basis of disability in federally funded programs. Section 504 of the Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). To establish liability for a violation of § 504, a plaintiff must prove that "(1) [she] is 'disabled' as defined by the Act; (2) [she] is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) [she] was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999). The substantive law governing this inquiry is functionally identical to that applied in the context of a claim under IDEA, which entitles every student to a "free appropriate public education." 20 U.S.C. § 1415(b)(6)(A); *see*

9

*D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 n.8 (3d Cir. 2012). The essential question

is whether the school district "reasonably accommodate[d] the needs of the handicapped

child so as to ensure meaningful participation in educational activities and meaningful

access to educational benefits." *Ridley School Dist. v. M.R.*, 680 F.3d 260, 280 (3d Cir.

2012) (citations omitted).[3]

K.K. first and foremost seeks an award of compensatory damages, which we have

recently held to require proof of intentional discrimination on the part of the school

district. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260–62 (3d

---

[3] Pennsylvania has "implement[ed] the statutory and regulatory requirements of §
504" at the state level through the enactment of Chapter 15. 22 Pa. Code § 15.1. In
pertinent part, the regulation states:

> A school district shall provide each protected handicapped
> student enrolled in the district, without cost to the student or
> family, those related aids, services or accommodations which
> are needed to afford the student equal opportunity to
> participate in and obtain the benefits of the school program
> and extracurricular activities without discrimination and to
> the maximum extent appropriate to the student's abilities.

*Id.* § 15.3.

K.K. argues that the phrase "to the maximum extent appropriate to the student's
abilities" signals that high-achieving disabled students are entitled to potential-
maximizing accommodations under Pennsylvania law. To the contrary, however, the
statutory text cautions that Chapter 15 does not "preempt, create, supplant, expand or
restrict the rights or liabilities of protected handicapped students or schools beyond what
is contemplated by Section 504." 22 Pa. Code § 15.11. *See also Lower Merion Sch.
Dist. v. Doe*, 931 A.2d 640, 644 (Pa. 2007) ("Chapter 15 of the Pennsylvania Code,
before it says anything else, states it is meant to comply with § 504 and its implementing
regulations."). K.K. cites no authority to contradict this more limited reading. We thus
treat § 504 and Chapter 15 as coextensive for purposes of our analysis.

Cir. 2013). A jury may infer intentional discrimination from a defendant's "deliberate indifference" to a student's rights under § 504. *Id.* at 263. In other words, a plaintiff must demonstrate the defendant's "(1) *knowledge* that a federally protected right is substantially likely to be violated . . . and (2) *failure to act* despite that knowledge." *Id.* at 265 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). "Deliberate indifference must be a deliberate choice, rather than negligence or bureaucratic inaction." *Id.* at 263 (quotation marks and citations omitted). The standard also "requires *actual knowledge*; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference." *Id.* at 266 n.26 (quoting *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012)).

We agree with the District Court that there is no genuine dispute of material fact as to whether the standard for deliberate indifference has been met in this case. The District's accommodations included both an original and a revised Section 504 plan that offered increasingly significant modifications to the school's advanced course requirements to fit K.K.'s needs as a gifted student. Virtually every interaction between K.K.'s parents and school administrators resulted in express steps being taken with the goal of addressing the challenges presented by K.K.'s difficult and unusual circumstances. And several further measures affirmatively suggested by the District were not accepted by K.K. and her parents, including use of the District's mental health services, coordination with K.K.'s psychologist, and evaluation under IDEA.

11

Accordingly, we will affirm the District Court's grant of summary judgment insofar as it pertains to K.K.'s claims for compensatory damages.

Although K.K. need not prove deliberate indifference to obtain declaratory, injunctive, or equitable relief under the Rehabilitation Act, she must still establish that the District is liable under the Act based on a failure "to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Ridley*, 680 F.3d at 280 (citations omitted). Our review of the record reveals that the District's homebound instruction policy was never intended to be a full substitute for in-class learning—but nor was it required to be. Instead, it is a stopgap procedure designed to give temporarily homebound students a reasonable opportunity to maintain pace with their coursework during a limited absence from the classroom setting. As implemented here, the policy resulted in District personnel working actively with K.K. and her parents to provide a modest approximation of the high-caliber instruction that K.K. had received while actively attending class.

We recognize that the record contains instances in which the District did not promptly reply to inquiries by K.K.'s parents and failed to detect K.K.'s self-imposed seclusion in the library. These lapses, however, taken in the context of the challenges presented by K.K.'s serious and unpredictable illnesses, simply do not rise to the level of a statutory violation. On the whole, the District's efforts provided K.K. with a meaningful opportunity to obtain passing marks in several of the school's most advanced courses and to maintain a scholastic record that led to enrollment in a prestigious

university. As such, because the record does not contain evidence of a violation of § 504, the District Court properly granted summary judgment in favor of the District on K.K.'s claims for declaratory, injunctive, and equitable relief.[4]

IV.

For the aforementioned reasons, we will affirm the District Court's order of October 16, 2013.

---

[4] We also note that claims for declaratory and injunctive relief under § 504 are mooted in most instances by the plaintiff-student's graduation from high school. *See Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216 (3d Cir. 2003) (citations omitted). An exception exists for claims which are "capable of repetition, yet evading review." *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1113 (3d Cir. 1992). K.K. does not argue that this exception applies in this case. Thus, because it is undisputed that K.K. graduated from Allderdice nearly four years ago, K.K. would not be entitled to declaratory or injunctive relief even if she could establish the District's liability under the Rehabilitation Act.