(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FRY ET VIR, AS NEXT FRIENDS OF MINOR E. F. *v.* NAPOLEON COMMUNITY SCHOOLS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 15–497. Argued October 31, 2016—Decided February 22, 2017

The Individuals with Disabilities Education Act (IDEA) offers federal funds to States in exchange for a commitment to furnish a "free appropriate public education" (FAPE) to children with certain disabilities, 20 U. S. C. §1412(a)(1)(A), and establishes formal administrative procedures for resolving disputes between parents and schools concerning the provision of a FAPE. Other federal statutes also protect the interests of children with disabilities, including Title II of the Americans with Disabilities Act (ADA) and §504 of the Rehabilitation Act. In *Smith* v. *Robinson*, 468 U. S. 992, this Court considered the interaction between those other laws and the IDEA, holding that the IDEA was "the exclusive avenue" through which a child with a disability could challenge the adequacy of his education. *Id.,* at 1009. Congress responded by passing the Handicapped Children's Protection Act of 1986, overturning *Smith*'s preclusion of non-IDEA claims and adding a carefully defined exhaustion provision. Under that provision, a plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws "seeking relief that is also available under [the IDEA]" must first exhaust the IDEA's administrative procedures. §1415(*l*).

Petitioner E. F. is a child with a severe form of cerebral palsy; a trained service dog named Wonder assists her with various daily life activities. When E. F.'s parents, petitioners Stacy and Brent Fry, sought permission for Wonder to join E. F. in kindergarten, officials at Ezra Eby Elementary School refused. The officials reasoned that the human aide provided as part of E. F.'s individualized education program rendered the dog superfluous. In response, the Frys removed E. F. from Ezra Eby and began homeschooling her. They also

filed a complaint with the Department of Education's Office for Civil Rights (OCR), claiming that the exclusion of E. F.'s service animal violated her rights under Title II and §504.  OCR agreed, and school officials invited E. F. to return to Ezra Eby with Wonder.  But the Frys, concerned about resentment from school officials, instead enrolled E. F. in a different school that welcomed the service dog.  The Frys then filed this suit in federal court against Ezra Eby's local and regional school districts and principal (collectively, the school districts), alleging that they violated Title II and §504 and seeking declaratory and monetary relief.  The District Court granted the school districts' motion to dismiss the suit, holding that §1415(*l*) required the Frys to first exhaust the IDEA's administrative procedures.  The Sixth Circuit affirmed, reasoning that §1415(*l*) applies whenever a plaintiff's alleged harms are "educational" in nature.

*Held*:

 1. Exhaustion of the IDEA's administrative procedures is unnecessary where the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee of a FAPE.  Pp. 9–18.

 (a) The language of §1415(*l*) compels exhaustion when a plaintiff seeks "relief" that is "available" under the IDEA.  Establishing the scope of §1415(*l*), then, requires identifying the circumstances in which the IDEA enables a person to obtain redress or access a benefit.  That inquiry immediately reveals the primacy of a FAPE in the statutory scheme.  The IDEA's stated purpose and specific commands center on ensuring a FAPE for children with disabilities.  And the IDEA's administrative procedures test whether a school has met this obligation: Any decision by a hearing officer on a request for substantive relief "shall" be "based on a determination of whether the child received a free appropriate public education."  §1415(f)(3)(E)(i).  Accordingly, §1415(*l*)'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a FAPE.  If a lawsuit charges such a denial, the plaintiff cannot escape §1415(*l*) merely by bringing the suit under a statute other than the IDEA.  But if the remedy sought in a suit brought under a different statute is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required.  Pp. 9–13.

 (b) In determining whether a plaintiff seeks relief for the denial of a FAPE, what matters is the gravamen of the plaintiff's complaint, setting aside any attempts at artful pleading.  That inquiry makes central the plaintiff's own claims, as §1415(*l*) explicitly requires in asking whether a lawsuit in fact "seeks" relief available under the IDEA.  But examination of a plaintiff's complaint should consider substance, not surface: §1415(*l*) requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way.  In ad-

dressing whether a complaint fits that description, a court should attend to the diverse means and ends of the statutes covering persons with disabilities. The IDEA guarantees individually tailored educational services for children with disabilities, while Title II and §504 promise nondiscriminatory access to public institutions for people with disabilities of all ages. That is not to deny some overlap in coverage: The same conduct might violate all three statutes. But still, these statutory differences mean that a complaint brought under Title II and §504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation. One clue to the gravamen of a complaint can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school? Second, could an adult at the school have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject. But when the answer is no, then the complaint probably does concern a FAPE. A further sign of the gravamen of a suit can emerge from the history of the proceedings. Prior pursuit of the IDEA's administrative remedies may provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term. Pp. 13–18.

　　2. This case is remanded to the Court of Appeals for a proper analysis of whether the gravamen of E. F.'s complaint charges, and seeks relief for, the denial of a FAPE. The Frys' complaint alleges only disability-based discrimination, without making any reference to the adequacy of the special education services E. F.'s school provided. Instead, the Frys have maintained that the school districts infringed E. F.'s right to equal access—even if their actions complied in full with the IDEA's requirements. But the possibility remains that the history of these proceedings might suggest something different. The parties have not addressed whether the Frys initially pursued the IDEA's administrative remedies, and the record is cloudy as to the relevant facts. On remand, the court below should establish whether (or to what extent) the Frys invoked the IDEA's dispute resolution process before filing suit. And if the Frys started down that road, the court should decide whether their actions reveal that the gravamen of their complaint is indeed the denial of a FAPE, thus necessitating further exhaustion. Pp. 18–20.

788 F. 3d 622, vacated and remanded.

　　KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

Syllabus

ALITO, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–497

STACY FRY, ET VIR, AS NEXT FRIENDS OF MINOR E. F., PETITIONERS *v.* NAPOLEON COMMUNITY SCHOOLS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[February 22, 2017]

JUSTICE KAGAN delivered the opinion of the Court.

The Individuals with Disabilities Education Act (IDEA or Act), 84 Stat. 175, as amended, 20 U. S. C. §1400 *et seq.*, ensures that children with disabilities receive needed special education services. One of its provisions, §1415(*l*), addresses the Act's relationship with other laws protecting those children. Section 1415(*l*) makes clear that nothing in the IDEA "restrict[s] or limit[s] the rights [or] remedies" that other federal laws, including antidiscrimination statutes, confer on children with disabilities. At the same time, the section states that if a suit brought under such a law "seek[s] relief that is also available under" the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures. In this case, we consider the scope of that exhaustion requirement. We hold that exhaustion is not necessary when the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee—what the Act calls a "free appropriate public education." §1412(a)(1)(A).

# I
## A

The IDEA offers federal funds to States in exchange for a commitment: to furnish a "free appropriate public education"—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities. *Ibid.*; see §1401(3)(A)(i) (listing covered disabilities). As defined in the Act, a FAPE comprises "special education and related services"—both "instruction" tailored to meet a child's "unique needs" and sufficient "supportive services" to permit the child to benefit from that instruction. §§1401(9), (26), (29); see *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176, 203 (1982). An eligible child, as this Court has explained, acquires a "substantive right" to such an education once a State accepts the IDEA's financial assistance. *Smith* v. *Robinson*, 468 U. S. 992, 1010 (1984).

Under the IDEA, an "individualized education program," called an IEP for short, serves as the "primary vehicle" for providing each child with the promised FAPE. *Honig* v. *Doe*, 484 U. S. 305, 311 (1988); see §1414(d). (Welcome to—and apologies for—the acronymic world of federal legislation.) Crafted by a child's "IEP Team"—a group of school officials, teachers, and parents—the IEP spells out a personalized plan to meet all of the child's "educational needs." §§1414(d)(1)(A)(i)(II)(bb), (d)(1)(B). Most notably, the IEP documents the child's current "levels of academic achievement," specifies "measurable annual goals" for how she can "make progress in the general education curriculum," and lists the "special education and related services" to be provided so that she can "advance appropriately toward [those] goals." §§1414(d)(1)(A)(i)(I), (II), (IV)(aa).

Because parents and school representatives sometimes cannot agree on such issues, the IDEA establishes formal procedures for resolving disputes. To begin, a dissatisfied

parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides). See §1415(b)(6). That pleading generally triggers a "[p]reliminary meeting" involving the contending parties, §1415(f)(1)(B)(i); at their option, the parties may instead (or also) pursue a full-fledged mediation process, see §1415(e). Assuming their impasse continues, the matter proceeds to a "due process hearing" before an impartial hearing officer. §1415(f)(1)(A); see §1415(f)(3)(A)(i). Any decision of the officer granting substantive relief must be "based on a determination of whether the child received a [FAPE]." §1415(f)(3)(E)(i). If the hearing is initially conducted at the local level, the ruling is appealable to the state agency. See §1415(g). Finally, a parent unhappy with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court. See §1415(i)(2)(A).

Important as the IDEA is for children with disabilities, it is not the only federal statute protecting their interests. Of particular relevance to this case are two antidiscrimination laws—Title II of the Americans with Disabilities Act (ADA), 42 U. S. C. §12131 *et seq.*, and §504 of the Rehabilitation Act, 29 U. S. C. §794—which cover both adults and children with disabilities, in both public schools and other settings. Title II forbids any "public entity" from discriminating based on disability; Section 504 applies the same prohibition to any federally funded "program or activity." 42 U. S. C. §§12131–12132; 29 U. S. C. §794(a). A regulation implementing Title II requires a public entity to make "reasonable modifications" to its "policies, practices, or procedures" when necessary to avoid such discrimination. 28 CFR §35.130(b)(7) (2016); see, *e.g., Alboniga* v. *School Bd. of Broward Cty.*, 87 F. Supp. 3d 1319, 1345 (SD Fla. 2015) (requiring an accommodation to permit use of a service animal under Title II). In simi-

lar vein, courts have interpreted §504 as demanding cer-
tain "reasonable" modifications to existing practices in
order to "accommodate" persons with disabilities. *Alexan-
der* v. *Choate*, 469 U. S. 287, 299–300 (1985); see, *e.g.,
Sullivan* v. *Vallejo City Unified School Dist.*, 731 F. Supp.
947, 961–962 (ED Cal. 1990) (requiring an accommodation
to permit use of a service animal under §504). And both
statutes authorize individuals to seek redress for viola-
tions of their substantive guarantees by bringing suits for
injunctive relief or money damages. See 29 U. S. C.
§794a(a)(2); 42 U. S. C. §12133.

This Court first considered the interaction between such
laws and the IDEA in *Smith* v. *Robinson*, 468 U. S. 992.[1]
The plaintiffs there sought "to secure a 'free appropriate
public education' for [their] handicapped child." *Id.,* at
994. But instead of bringing suit under the IDEA alone,
they appended "virtually identical" claims (again alleging
the denial of a "free appropriate public education") under
§504 of the Rehabilitation Act and the Fourteenth
Amendment's Equal Protection Clause. *Id.,* at 1009; see
*id.,* at 1016. The Court held that the IDEA altogether
foreclosed those additional claims: With its "comprehen-
sive" and "carefully tailored" provisions, the Act was "the
exclusive avenue" through which a child with a disability
(or his parents) could challenge the adequacy of his educa-
tion. *Id.,* at 1009; see *id.,* at 1013, 1016, 1021.

Congress was quick to respond. In the Handicapped
Children's Protection Act of 1986, 100 Stat. 796, it over-
turned *Smith*'s preclusion of non-IDEA claims while also
adding a carefully defined exhaustion requirement. Now
codified at 20 U. S. C. §1415(*l*), the relevant provision of

--------

[1] At the time (and until 1990), the IDEA was called the Education of
the Handicapped Act, or EHA. See §901(a), 104 Stat. 1141–1142
(renaming the statute). To avoid confusion—and acronym overload—
we refer throughout this opinion only to the IDEA.

that statute reads:

> "Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act [including §504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA]."

The first half of §1415(*l*) (up until "except that") "reaffirm[s] the viability" of federal statutes like the ADA or Rehabilitation Act "as separate vehicles," no less integral than the IDEA, "for ensuring the rights of handicapped children." H. R. Rep. No. 99–296, p. 4 (1985); see *id.,* at 6. According to that opening phrase, the IDEA does not prevent a plaintiff from asserting claims under such laws even if, as in *Smith* itself, those claims allege the denial of an appropriate public education (much as an IDEA claim would). But the second half of §1415(*l*) (from "except that" onward) imposes a limit on that "anything goes" regime, in the form of an exhaustion provision. According to that closing phrase, a plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances—that is, when "seeking relief that is also available under" the IDEA—first exhaust the IDEA's administrative procedures. The reach of that requirement is the issue in this case.

## B

Petitioner E. F. is a child with a severe form of cerebral palsy, which "significantly limits her motor skills and

mobility."  App. to Brief in Opposition 6, Complaint ¶19.[2]
When E. F. was five years old, her parents—petitioners
Stacy and Brent Fry—obtained a trained service dog for
her, as recommended by her pediatrician.  The dog, a
goldendoodle named Wonder, "help[s E. F.] to live as
independently as possible" by assisting her with various
life activities.  *Id.,* at 2, ¶3.  In particular, Wonder aids
E. F. by "retrieving dropped items, helping her balance
when she uses her walker, opening and closing doors,
turning on and off lights, helping her take off her coat,
[and] helping her transfer to and from the toilet."  *Id.,* at 7,
¶27.

But when the Frys sought permission for Wonder to join
E. F. in kindergarten, officials at Ezra Eby Elementary
School refused the request.  Under E. F.'s existing IEP, a
human aide provided E. F. with one-on-one support
throughout the day; that two-legged assistance, the school
officials thought, rendered Wonder superfluous.  In the
words of one administrator, Wonder should be barred from
Ezra Eby because all of E. F.'s "physical and academic
needs [were] being met through the services/programs/
accommodations" that the school had already agreed to.
*Id.,* at 8, ¶33.  Later that year, the school officials briefly
allowed Wonder to accompany E. F. to school on a trial
basis; but even then, "the dog was required to remain in
the back of the room during classes, and was forbidden
from assisting [E. F.] with many tasks he had been specifi-
cally trained to do."  *Ibid.,* ¶35.  And when the trial period
concluded, the administrators again informed the Frys
that Wonder was not welcome.  As a result, the Frys re-
moved E. F. from Ezra Eby and began homeschooling her.

----

[2] Because this case comes to us on review of a motion to dismiss
E. F.'s suit, we accept as true all facts pleaded in her complaint.  See
*Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination
Unit*, 507 U. S. 163, 164 (1993).

In addition, the Frys filed a complaint with the U. S. Department of Education's Office for Civil Rights (OCR), charging that Ezra Eby's exclusion of E. F.'s service animal violated her rights under Title II of the ADA and §504 of the Rehabilitation Act. Following an investigation, OCR agreed. The office explained in its decision letter that a school's obligations under those statutes go beyond providing educational services: A school could offer a FAPE to a child with a disability but still run afoul of the laws' ban on discrimination. See App. 30–32. And here, OCR found, Ezra Eby had indeed violated that ban, even if its use of a human aide satisfied the FAPE standard. See *id.,* at 35–36. OCR analogized the school's conduct to "requir[ing] a student who uses a wheelchair to be carried" by an aide or "requir[ing] a blind student to be led [around by a] teacher" instead of permitting him to use a guide dog or cane. *Id.,* at 35. Regardless whether those—or Ezra Eby's—policies denied a FAPE, they violated Title II and §504 by discriminating against children with disabilities. See *id.,* at 35–36.

In response to OCR's decision, school officials at last agreed that E. F. could come to school with Wonder. But after meeting with Ezra Eby's principal, the Frys became concerned that the school administration "would resent [E. F.] and make her return to school difficult." App. to Brief in Opposition 10, ¶48. Accordingly, the Frys found a different public school, in a different district, where administrators and teachers enthusiastically received both E. F. and Wonder.

C

The Frys then filed this suit in federal court against the local and regional school districts in which Ezra Eby is located, along with the school's principal (collectively, the school districts). The complaint alleged that the school districts violated Title II of the ADA and §504 of the Re-

habilitation Act by "denying [E. F.] equal access" to Ezra Eby and its programs, "refus[ing] to reasonably accommodate" E. F.'s use of a service animal, and otherwise "discriminat[ing] against [E. F.] as a person with disabilities." *Id.,* at 15, ¶68, 17–18, ¶¶82–83. According to the complaint, E. F. suffered harm as a result of that discrimination, including "emotional distress and pain, embarrassment, [and] mental anguish." *Id.,* at 11–12, ¶51. In their prayer for relief, the Frys sought a declaration that the school districts had violated Title II and §504, along with money damages to compensate for E. F.'s injuries.

The District Court granted the school districts' motion to dismiss the suit, holding that §1415(*l*) required the Frys to first exhaust the IDEA's administrative procedures. See App. to Pet. for Cert. 50. A divided panel of the Court of Appeals for the Sixth Circuit affirmed on the same ground. In that court's view, §1415(*l*) applies if "the injuries [alleged in a suit] relate to the specific substantive protections of the IDEA." 788 F. 3d 622, 625 (2015). And that means, the court continued, that exhaustion is necessary whenever "the genesis and the manifestations" of the complained-of harms were "educational" in nature. *Id.,* at 627 (quoting *Charlie F.* v. *Board of Ed. of Skokie School Dist. 68*, 98 F. 3d 989, 993 (CA7 1996)). On that understanding of §1415(*l*), the Sixth Circuit held, the Frys' suit could not proceed: Because the harms to E. F. were generally "educational"—most notably, the court reasoned, because "Wonder's absence hurt her sense of independence and social confidence at school"—the Frys had to exhaust the IDEA's procedures. 788 F. 3d, at 627. Judge Daughtrey dissented, emphasizing that in bringing their Title II and §504 claims, the Frys "did not allege the denial of a FAPE" or "seek to modify [E. F.'s] IEP in any way." *Id.,* at 634.

We granted certiorari to address confusion in the courts of appeals as to the scope of §1415(*l*)'s exhaustion re-

quirement. 579 U. S. \_\_\_ (2016).[3] We now vacate the Sixth Circuit's decision.

## II

Section 1415(*l*) requires that a plaintiff exhaust the IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or similar laws when (but only when) her suit "seek[s] relief that is also available" under the IDEA. We first hold that to meet that statutory standard, a suit must seek relief for the denial of a FAPE, because that is the only "relief" the IDEA makes "available." We next conclude that in determining whether a suit indeed "seeks" relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint.[4]

### A

In this Court, the parties have reached substantial agreement about what "relief" the IDEA makes "available" for children with disabilities—and about how the

———————

[3] See *Payne* v. *Peninsula School Dist.*, 653 F. 3d 863, 874 (CA9 2011) (en banc) (cataloguing different Circuits' understandings of §1415(*l*)). In particular, the Ninth Circuit has criticized an approach similar to the Sixth Circuit's for "treat[ing] §1415(*l*) as a quasi-preemption provision, requiring administrative exhaustion for any case that falls within the general 'field' of educating disabled students." *Id.,* at 875.

[4] In reaching these conclusions, we leave for another day a further question about the meaning of §1415(*l*): Is exhaustion required when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests—here, money damages for emotional distress—is not one that an IDEA hearing officer may award? The Frys, along with the Solicitor General, say the answer is no. See Reply Brief 2–3; Brief for United States as *Amicus Curiae* 16. But resolution of that question might not be needed in this case because the Frys also say that their complaint is not about the denial of a FAPE, see Reply Brief 17—and, as later explained, we must remand that distinct issue to the Sixth Circuit, see *infra*, at 18–20. Only if that court rejects the Frys' view of their lawsuit, using the analysis we set out below, will the question about the effect of their request for money damages arise.

Sixth Circuit went wrong in addressing that question. The Frys maintain that such a child can obtain remedies under the IDEA for decisions that deprive her of a FAPE, but none for those that do not. So in the Frys' view, §1415(*l*)'s exhaustion requirement can come into play only when a suit concerns the denial of a FAPE—and not, as the Sixth Circuit held, when it merely has some articulable connection to the education of a child with a disability. See Reply Brief 13–15. The school districts, for their part, also believe that the Sixth Circuit's exhaustion standard "goes too far" because it could mandate exhaustion when a plaintiff is "seeking relief that is *not* in substance available" under the IDEA. Brief for Respondents 30. And in particular, the school districts acknowledge that the IDEA makes remedies available only in suits that "directly implicate[]" a FAPE—so that only in those suits can §1415(*l*) apply. Tr. of Oral Arg. 46. For the reasons that follow, we agree with the parties' shared view: The only relief that an IDEA officer can give—hence the thing a plaintiff must seek in order to trigger §1415(*l*)'s exhaustion rule—is relief for the denial of a FAPE.

We begin, as always, with the statutory language at issue, which (at risk of repetition) compels exhaustion when a plaintiff seeks "relief" that is "available" under the IDEA. The ordinary meaning of "relief" in the context of a lawsuit is the "redress[] or benefit" that attends a favorable judgment. Black's Law Dictionary 1161 (5th ed. 1979). And such relief is "available," as we recently explained, when it is "accessible or may be obtained." *Ross* v. *Blake*, 578 U. S. ___, ___ (2016) (slip op., at 8) (quoting Webster's Third New International Dictionary 150 (1993)). So to establish the scope of §1415(*l*), we must identify the circumstances in which the IDEA enables a person to obtain redress (or, similarly, to access a benefit).

That inquiry immediately reveals the primacy of a FAPE in the statutory scheme. In its first section, the

IDEA declares as its first purpose "to ensure that all children with disabilities have available to them a free appropriate public education." §1400(d)(1)(A). That principal purpose then becomes the Act's principal command: A State receiving federal funding under the IDEA must make such an education "available to all children with disabilities." §1412(a)(1)(A). The guarantee of a FAPE to those children gives rise to the bulk of the statute's more specific provisions. For example, the IEP—"the centerpiece of the statute's education delivery system"—serves as the "vehicle" or "means" of providing a FAPE. *Honig*, 484 U. S., at 311; *Rowley*, 458 U. S., at 181; see *supra,* at 2. And finally, as all the above suggests, the FAPE requirement provides the yardstick for measuring the adequacy of the education that a school offers to a child with a disability: Under that standard, this Court has held, a child is entitled to "meaningful" access to education based on her individual needs. *Rowley,* 458 U. S., at 192.[5]

The IDEA's administrative procedures test whether a school has met that obligation—and so center on the Act's FAPE requirement. As noted earlier, any decision by a hearing officer on a request for substantive relief "shall" be "based on a determination of whether the child received a free appropriate public education." §1415(f)(3)(E)(i); see *supra,* at 3.[6] Or said in Latin: In the IDEA's administrative process, a FAPE denial is the *sine qua non*. Suppose that a parent's complaint protests a school's failure to provide some accommodation for a child with a disability.

---

[5] A case now before this Court, *Endrew F.* v. *Douglas County School Dist. RE–1*, No. 15–827, presents unresolved questions about the precise content of the FAPE standard.

[6] Without finding the denial of a FAPE, a hearing officer may do nothing more than order a school district to comply with the Act's various procedural requirements, see §1415(f)(3)(E)(iii)—for example, by allowing parents to "examine all records" relating to their child, §1415(b)(1).

If that accommodation is needed to fulfill the IDEA's FAPE requirement, the hearing officer must order relief. But if it is not, he cannot—even though the dispute is between a child with a disability and the school she attends. There might be good reasons, unrelated to a FAPE, for the school to make the requested accommodation. Indeed, another federal law (like the ADA or Rehabilitation Act) might *require* the accommodation on one of those alternative grounds. See *infra*, at 15. But still, the hearing officer cannot provide the requested relief. His role, under the IDEA, is to enforce the child's "substantive right" to a FAPE. *Smith,* 468 U. S., at 1010. And that is all.[7]

For that reason, §1415(*l*)'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a free appropriate public education. If a lawsuit charges such a denial, the plaintiff cannot escape §1415(*l*) merely by bringing her suit under a statute other than the IDEA—as when, for example, the plaintiffs in *Smith* claimed that a school's failure to provide a FAPE also violated the Rehabilitation Act.[8] Rather, that plaintiff must first submit her case to an IDEA hearing officer, experienced in addressing exactly the issues she raises. But if, in a suit brought under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required. After all, the plaintiff could not get any relief from those procedures: A hearing officer, as just

----

[7] Similarly, a court in IDEA litigation may provide a substantive remedy only when it determines that a school has denied a FAPE. See *School Comm. of Burlington* v. *Department of Ed. of Mass.*, 471 U. S. 359, 369 (1985). Without such a finding, that kind of relief is (once again) unavailable under the Act.

[8] Once again, we do not address here (or anywhere else in this opinion) a case in which a plaintiff, although charging the denial of a FAPE, seeks a form of remedy that an IDEA officer cannot give—for example, as in the Frys' complaint, money damages for resulting emotional injury. See n. 4, *supra.*

explained, would have to send her away empty-handed. And that is true even when the suit arises directly from a school's treatment of a child with a disability—and so could be said to relate in some way to her education. A school's conduct toward such a child—say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA. A complaint seeking redress for those other harms, independent of any FAPE denial, is not subject to §1415(*l*)'s exhaustion rule because, once again, the only "relief" the IDEA makes "available" is relief for the denial of a FAPE.

## B

Still, an important question remains: How is a court to tell when a plaintiff "seeks" relief for the denial of a FAPE and when she does not? Here, too, the parties have found some common ground: By looking, they both say, to the "substance" of, rather than the labels used in, the plaintiff's complaint. Brief for Respondents 20; Reply Brief 7–8. And here, too, we agree with that view: What matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading.

That inquiry makes central the plaintiff's own claims, as §1415(*l*) explicitly requires. The statutory language asks whether a lawsuit in fact "seeks" relief available under the IDEA—not, as a stricter exhaustion statute might, whether the suit "could have sought" relief available under the IDEA (or, what is much the same, whether any remedies "are" available under that law). See Brief for United States as *Amicus Curiae* 20 (contrasting §1415(*l*) with the exhaustion provision in the Prison Litigation Reform Act, 42 U. S. C. §1997e(a)). In effect, §1415(*l*) treats the plaintiff as "the master of the claim": She identifies its remedial basis—and is subject to exhaus-

tion or not based on that choice. *Caterpillar Inc.* v. *Williams*, 482 U. S. 386, 392, and n. 7 (1987). A court deciding whether §1415(*l*) applies must therefore examine whether a plaintiff's complaint—the principal instrument by which she describes her case—seeks relief for the denial of an appropriate education.

But that examination should consider substance, not surface. The use (or non-use) of particular labels and terms is not what matters. The inquiry, for example, does not ride on whether a complaint includes (or, alternatively, omits) the precise words(?) "FAPE" or "IEP." After all, §1415(*l*)'s premise is that the plaintiff is suing under a statute *other than* the IDEA, like the Rehabilitation Act; in such a suit, the plaintiff might see no need to use the IDEA's distinctive language—even if she is in essence contesting the adequacy of a special education program. And still more critically, a "magic words" approach would make §1415(*l*)'s exhaustion rule too easy to bypass. Just last Term, a similar worry led us to hold that a court's jurisdiction under the Foreign Sovereign Immunities Act turns on the "gravamen," or "essentials," of the plaintiff's suit. *OBB Personenverkehr AG* v. *Sachs*, 577 U. S. ___, ___, ___, ___ (2015) (slip op., at 6, 8, 9). "[A]ny other approach," we explained, "would allow plaintiffs to evade the Act's restrictions through artful pleading." *Id.,* at ___ (slip op., at 8). So too here. Section 1415(*l*) is not merely a pleading hurdle. It requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way.

In addressing whether a complaint fits that description, a court should attend to the diverse means and ends of the statutes covering persons with disabilities—the IDEA on the one hand, the ADA and Rehabilitation Act (most notably) on the other. The IDEA, of course, protects only "children" (well, really, adolescents too) and concerns only

their schooling. §1412(a)(1)(A). And as earlier noted, the statute's goal is to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her "unique needs." §1401(29); see *Rowley*, 458 U. S., at 192, 198; *supra,* at 11. By contrast, Title II of the ADA and §504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools. And those statutes aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs. See *supra,* at 3–4. In short, the IDEA guarantees individually tailored educational services, while Title II and §504 promise nondiscriminatory access to public institutions. That is not to deny some overlap in coverage: The same conduct might violate all three statutes—which is why, as in *Smith*, a plaintiff might seek relief for the denial of a FAPE under Title II and §504 as well as the IDEA. But still, the statutory differences just discussed mean that a complaint brought under Title II and §504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation.

One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor— have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit

could go forward.  But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

Take two contrasting examples.  Suppose first that a wheelchair-bound child sues his school for discrimination under Title II (again, without mentioning the denial of a FAPE) because the building lacks access ramps.  In some sense, that architectural feature has educational conse-quences, and a different lawsuit might have alleged that it violates the IDEA: After all, if the child cannot get inside the school, he cannot receive instruction there; and if he must be carried inside, he may not achieve the sense of independence conducive to academic (or later to real-world) success.  But is the denial of a FAPE really the gravamen of the plaintiff's Title II complaint?  Consider that the child could file the same basic complaint if a municipal library or theater had no ramps.  And similarly, an employee or visitor could bring a mostly identical com-plaint against the school.  That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not ade-quacy of special education.  See *supra,* at 7 (describing OCR's use of a similar example).  And so §1415(*l*) does not require exhaustion.[9]

––––––––––

[9]The school districts offer another example illustrating the point. They suppose that a teacher, acting out of animus or frustration, strikes a student with a disability, who then sues the school under a statute other than the IDEA.  See Brief for Respondents 36–37.  Here too, the suit could be said to relate, in both genesis and effect, to the child's education.  But the school districts opine, we think correctly, that the substance of the plaintiff's claim is unlikely to involve the adequacy of special education—and thus is unlikely to require exhaus-tion.  See *ibid.*  A telling indicator of that conclusion is that a child could file the same kind of suit against an official at another public

But suppose next that a student with a learning disability sues his school under Title II for failing to provide remedial tutoring in mathematics. That suit, too, might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation; the complaint might make no reference at all to a FAPE or an IEP. But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? The difficulty of transplanting the complaint to those other contexts suggests that its essence—even though not its wording—is the provision of a FAPE, thus bringing §1415(*l*) into play.[10]

A further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings. In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream. Recall that a parent

—————

facility for inflicting such physical abuse—as could an adult subject to similar treatment by a school official. To be sure, the particular circumstances of such a suit (school or theater? student or employee?) might be pertinent in assessing the reasonableness of the challenged conduct. But even if that is so, the plausibility of bringing other variants of the suit indicates that the gravamen of the plaintiff's complaint does not concern the appropriateness of an educational program.

[10] According to JUSTICE ALITO, the hypothetical inquiries described above are useful only if the IDEA and other federal laws are mutually exclusive in scope. See *post*, at 1 (opinion concurring in part and concurring in judgment). That is incorrect. The point of the questions is not to show that a plaintiff faced with a particular set of circumstances could *only* have proceeded under Title II or §504—or, alternatively, could *only* have proceeded under the IDEA. (Depending on the circumstances, she might well have been able to proceed under both.) Rather, these questions help determine whether a plaintiff who has chosen to bring a claim under Title II or §504 instead of the IDEA—and whose complaint makes no mention of a FAPE—nevertheless raises a claim whose *substance* is the denial of an appropriate education.

dissatisfied with her child's education initiates those administrative procedures by filing a complaint, which triggers a preliminary meeting (or possibly mediation) and then a due process hearing.  See *supra,* at 2–3.  A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy.  Whether that is so depends on the facts; a court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely.  But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term.[11]

## III

The Court of Appeals did not undertake the analysis we have just set forward.  As noted above, it asked whether E. F.'s injuries were, broadly speaking, "educational" in nature.  See *supra,* at 8; 788 F. 3d, at 627 (reasoning that the "value of allowing Wonder to attend [school] with E. F. was educational" because it would foster "her sense of independence and social confidence," which is "the sort of interest the IDEA protects").  That is not the same as asking whether the gravamen of E. F.'s complaint charges, and seeks relief for, the denial of a FAPE.  And that difference in standard may have led to a difference in result in

---

[11]The point here is limited to commencement of the IDEA's formal administrative procedures; it does not apply to more informal requests to IEP Team members or other school administrators for accommodations or changes to a special education program.  After all, parents of a child with a disability are likely to bring *all* grievances first to those familiar officials, whether or not they involve the denial of a FAPE.

this case. Understood correctly, §1415(*l*) might not require exhaustion of the Frys' claim. We lack some important information on that score, however, and so we remand the issue to the court below.

The Frys' complaint alleges only disability-based discrimination, without making any reference to the adequacy of the special education services E. F.'s school provided. The school districts' "refusal to allow Wonder to act as a service dog," the complaint states, "discriminated against [E. F.] as a person with disabilities . . . by denying her equal access" to public facilities. App. to Brief in Opposition 15, Complaint ¶68. The complaint contains no allegation about the denial of a FAPE or about any deficiency in E. F.'s IEP. More, it does not accuse the school even in general terms of refusing to provide the educational instruction and services that E. F. needs. See 788 F. 3d, at 631 (acknowledging that the Frys do not "state that Wonder enhances E. F.'s educational opportunities"). As the Frys explained in this Court: The school districts "have said all along that because they gave [E. F.] a one-on-one [human] aide, that all of her . . . educational needs were satisfied. And we have not challenged that, and it would be difficult for us to challenge that." Tr. of Oral Arg. 16. The Frys instead maintained, just as OCR had earlier found, that the school districts infringed E. F.'s right to equal access—even if their actions complied in full with the IDEA's requirements. See App. to Brief in Opposition 15, 18–19, Complaint ¶¶ 69, 85, 87; App. 34–37; *supra,* at 7–8.

And nothing in the nature of the Frys' suit suggests any implicit focus on the adequacy of E. F.'s education. Consider, as suggested above, that the Frys could have filed essentially the same complaint if a public library or theater had refused admittance to Wonder. See *supra,* at 16. Or similarly, consider that an adult visitor to the school could have leveled much the same charges if prevented

from entering with his service dog.  See *ibid.*  In each case, the plaintiff would challenge a public facility's policy of precluding service dogs (just as a blind person might challenge a policy of barring guide dogs, see *supra*, at 7) as violating Title II's and §504's equal access requirements. The suit would have nothing to do with the provision of educational services.  From all that we know now, that is exactly the kind of action the Frys have brought.

But we do not foreclose the possibility that the history of these proceedings might suggest something different.  As earlier discussed, a plaintiff's initial pursuit of the IDEA's administrative remedies can serve as evidence that the gravamen of her later suit is the denial of a FAPE, even though that does not appear on the face of her complaint. See *supra,* at 17–18.  The Frys may or may not have sought those remedies before filing this case: None of the parties here have addressed that issue, and the record is cloudy as to the relevant facts.  Accordingly, on remand, the court below should establish whether (or to what extent) the Frys invoked the IDEA's dispute resolution process before bringing this suit.  And if the Frys started down that road, the court should decide whether their actions reveal that the gravamen of their complaint is indeed the denial of a FAPE, thus necessitating further exhaustion.

With these instructions and for the reasons stated, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–497

_____

STACY FRY, ET VIR, AS NEXT FRIENDS OF MINOR E. F.,
PETITIONERS *v.* NAPOLEON COMMUNITY
SCHOOLS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[February 22, 2017]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring in part and concurring in the judgment.

I join all of the opinion of the Court with the exception of its discussion (in the text from the beginning of the first new paragraph on page 15 to the end of the opinion) in which the Court provides several misleading "clue[s]," *ante*, at 15, for the lower courts.

The Court first instructs the lower courts to inquire whether the plaintiff could have brought "essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library." *Ibid.* Next, the Court says, a court should ask whether "an *adult* at the school—say, an employee or visitor—[could] have pressed essentially the same grievance." *Ibid.* These clues make sense only if there is no overlap between the relief available under the following two sets of claims: (1) the relief provided by the Individuals with Disabilities Education Act (IDEA), and (2) the relief provided by other federal laws (including the Constitution, the Americans with Disabilities Act of 1990 (ADA), and the Rehabilitation Act of 1973). The Court does not show or even claim that there is no such overlap—to the contrary, it observes that "[t]he same conduct might vio-

late" the ADA, the Rehabilitation Act and the IDEA. *Ibid.* And since these clues work only in the absence of overlap, I would not suggest them.

The Court provides another false clue by suggesting that lower courts take into account whether parents, before filing suit under the ADA or the Rehabilitation Act, began to pursue but then abandoned the IDEA's formal procedures. *Ante*, at 17–18. This clue also seems to me to be ill-advised. It is easy to imagine circumstances under which parents might start down the IDEA road and then change course and file an action under the ADA or the Rehabilitation Act that seeks relief that the IDEA cannot provide. The parents might be advised by their attorney that the relief they were seeking under the IDEA is not available under that law but is available under another. Or the parents might change their minds about the relief that they want, give up on the relief that the IDEA can provide, and turn to another statute.

Although the Court provides these clues for the purpose of assisting the lower courts, I am afraid that they may have the opposite effect. They are likely to confuse and lead courts astray.