**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

―――――――――

No. 23-1595

―――――――――

B. S. M.; GABRIELLE M.,

Appellants

v.

UPPER DARBY SCHOOL DISTRICT

―――――――――――――――――

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2-21-cv-05164)
District Judge:  Honorable Anita B. Brody

―――――――――――――――――

Argued January 17, 2024

Before: JORDAN, BIBAS, and AMBRO, Circuit Judges

(Opinion filed: June 4, 2024)

Michael J. Connolly
Dennis C. McAndrews
D. Daniel Woody  **[Argued]**
McAndrews Mehalick Connolly Hulse & Ryan
30 Cassatt Avenue
Berwyn, PA 19312

Counsel for Appellants

Michele J. Mintz
Beth N. Shore **[Argued]**
Fox Rothschild
980 Jolly Road
Suite 110
Blue Bell, PA 19422

Counsel for Appellee

---

OPINION OF THE COURT

---

**AMBRO**, Circuit Judge

Student B.S.M. ("Brooklyn") and her parent Gabrielle M. filed an administrative special education due process complaint against the Upper Darby School District (the "School District" or "District") seeking compensatory education pursuant to both the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"),

29 U.S.C. § 794. The impartial special education hearing officer held that the District had denied Brooklyn a Free Appropriate Public Education ("FAPE") when it provided an inadequate 504 plan but had not violated its "Child Find" obligation to identify Brooklyn timely under either statute. Her family filed a complaint in the United States District Court for the Eastern District of Pennsylvania, which affirmed the hearing officer's decision. Granting judgment on the administrative record to the School District, the Court stated that having analyzed Brooklyn's Child Find claim under the IDEA, it need not separately analyze it under Section 504. We disagree and therefore vacate and remand.

## I.     BACKGROUND

Brooklyn is a thirteen-year-old student who attended Upper Darby schools through sixth grade, after which she was enrolled in private school. On appeal, her family contends that the School District violated its Child Find obligation to identify Brooklyn as eligible for services under Section 504 when it failed to perform a comprehensive evaluation of her until fourth grade, despite her family requesting a comprehensive evaluation as early as kindergarten. To evaluate this, we find it useful to describe Brooklyn's medical and educational history during the period at issue.

### a.  Kindergarten

Brooklyn's family claims that her academic and social-emotional problems were evident as early as kindergarten (the 2016-2017 year), when her teacher noted on Brooklyn's report card that she needed improvement in attention and verbal/physical "self[-]control." App. at 889. In the middle of

3

that year, Gabrielle "requested that the [School] District conduct a full psychoeducational evaluation of" Brooklyn. App. at 37. It reviewed her academic records and concluded that a full evaluation was unnecessary given her satisfactory performance on classroom-based assessments ("CBA") and the Dynamic Indicators of Basic Early Literacy Skills ("DIBELS").[1] According to the School District's own records, however, Brooklyn was below or well below the benchmark in sound fluency, phoneme segmentation, letter naming, and the DIBELS composite score. Her reading CBA scores were mostly not yet proficient, and her math CBA scores also included multiple basic scores and one below basic score.

The School District proposed conducting a speech and language evaluation, to which Gabrielle agreed. The evaluation report showed that Brooklyn was eligible for special education services "under the IDEA disability category of Speech or Language Impairmen[t]," and the School District developed an Individualized Education Plan ("IEP") addressing those needs. *Id.* She received speech and language therapy for the remainder of her kindergarten year and through first grade and most of second grade.

Per the assessments at the end of her kindergarten year, Brooklyn was still not yet proficient in six academic areas

---

[1] Brooklyn was evaluated under many testing systems and in many subjects, with rubrics variously using "At Benchmark," "Proficient," and "Average" to indicate satisfactory performance. For more detailed description of her scores, *see* App. at 698-701; 734; 772; 802-04; 850-56; 864-66; 895-915; 929-35.

4

related to both reading and math. The school did not, however, perform a Section 504 evaluation.

### b. First Grade

Brooklyn continued to struggle in first grade, receiving below basic on her Measures of Academic Performance ("MAP") math assessments and basic on her MAP reading assessments. Her DIBELS reading assessments produced multiple below or well below basic scores in nonsense word fluency for whole words read, accuracy, and retell quality of response. She was still not evaluated for a Section 504 plan.

### c. Second Grade

At the start of second grade, Brooklyn's scores were much the same: most of her MAP assessments were basic in both reading and math. Her DIBELS scores—as well as her scores on another benchmark assessment, the AIMSweb— indicated she was still below the benchmark on nonsense word fluency for whole words read and accuracy.

The facts are more contested as to Brooklyn's emotional struggles in this period. During an annual check-up with her family physician, she expressed suicidal ideation. Concerned whether she truly felt that way or was "saying these things [] for attention," App. at 847, Gabrielle had Brooklyn evaluated by the Child Guidance Resource Center on February 18, 2019, where a licensed psychologist diagnosed her with "Other Specified Depressive Disorder" and referred her to weekly outpatient therapy, App. at 847-48.

5

The District Court found it to be "unclear" whether Gabrielle shared this diagnosis with the School District. To undermine any inference that it knew of the diagnosis, the District points to the family's actions during Brooklyn's reevaluation process under the IDEA, which took place around the same time as her private psychological evaluation. As part of that process, Gabrielle completed a parent input form, received February 26, 2023; she stated that Brooklyn's strengths were in "reading, math, [and] art[,]" and that she needed a "small teaching environment" and "calm and patient surroundings." App. at 801. Brooklyn's father provided a parent input form the same day, stating that her strengths were in "reading, writing, [and] art[,]" and that she needed help in math. *Id.* Neither parent mentioned, however, Brooklyn's depression diagnosis; instead, both left blank the "[m]edical history" section of the form. Before the hearing officer, Gabrielle testified that she did share the diagnosis with the school, but the officer, considering its absence on the parent input forms, as well as Gabrielle's inability to remember when she allegedly shared the diagnosis, found that she did not do so at that time.

On April 12, 2019, following evaluation by a speech and language pathologist, Brooklyn was discharged from special-education services.

### d. Third Grade

Brooklyn continued to struggle emotionally and academically in third grade. In October, her classroom teacher called Gabrielle to discuss that "Brooklyn ha[d] been getting very upset often and at random times and often w[ould] begin

to cry." App. at 839. At her mother's request and with the approval of the school principal, the teacher referred Brooklyn to the school social worker. According to her teacher, Brooklyn "lack[ed] self-confidence" and would sometimes "arrive at school upset and would refuse to talk and wasn't able to quickly/timely recover from the setback." App. at 673.

Academically, she started the year scoring below average on her reading and writing tests. In the third marking period, she scored below average on three of six assessments, and in the fourth marking period she was below average on all of them, plus all her math chapter tests. App. at 854-55.

e. Fourth Grade

At the beginning of fourth grade, Brooklyn scored below basic in math and reading MAP assessments, and her initial CBAs showed well below average performance in reading and below average in writing. Indeed, she would score above basic only once throughout the entire year.

Brooklyn's emotional struggles continued. In October of 2020, she was privately evaluated by another licensed psychologist, who diagnosed her with "Disruptive Mood Regulation Disorder" and recommended she receive ten hours per month of therapy. App. at 831. Following this report, issued October 5, Gabrielle requested that the School District provide Brooklyn with a 504 plan. The District promptly responded on October 8 by requesting her family's consent for a comprehensive psychoeducational evaluation of Brooklyn, which they granted. A board-certified school psychologist conducted the evaluation, reviewing Brooklyn's educational records and outside reports received by Gabrielle, obtaining

7

input about Brooklyn's development and behavior from both her parents, observing her in a virtual classroom on two occasions, and administering cognitive and achievement testing with ratings from Brooklyn, Gabrielle, and one of her fourth-grade teachers.

The psychologist issued her evaluation report on December 4, concluding that Brooklyn was not eligible for specially designed instruction. Per the psychologist, there was no discrepancy between Brooklyn's ability and her performance, as is necessary to meet the IDEA criteria for a Specific Learning Disability, nor did she meet the IDEA criteria for Emotional Disturbance. The psychologist did, however, recommend that the District develop a 504 plan to address Brooklyn's social and emotional needs. On February 26, 2021, the School District convened to develop such a 504 plan addressing Brooklyn's math weaknesses as well as her social and emotional needs. Gabrielle consented to implementing the plan, though she wrote that she believed Brooklyn "need[ed] the support of an IEP." App. at 688.

Even after the 504 plan was implemented, Brooklyn continued to exhibit troubling behavior at home, and Gabrielle hired a private certified school psychologist to conduct an independent review of the School District's evaluation report. On June 8, 2021, after administering various cognitive and emotional tests and interviewing Brooklyn and Gabrielle, that psychologist issued her own evaluation report. She agreed with the District that Brooklyn was not eligible for an IEP under the IDEA category of Emotional Disturbance, despite her depression and suicidal ideation, but opined that she was eligible under the IDEA category of Specific Learning Disability.

f.  The Administrative Process and the District Court's Decision

Unsatisfied with the School District's decision not to provide Brooklyn an IEP, Gabrielle filed an administrative due process complaint on March 31, 2021, seeking the District to develop an appropriate program and placement for Brooklyn, as well as compensatory education dating back to March 31, 2019.[2]  Gabrielle contended that the District had denied Brooklyn a FAPE under the IDEA and Section 504 because it had: (1) failed to satisfy its Child Find requirement properly and timely to identify and evaluate students who are potentially eligible for special-education services; (2) incorrectly determined that Brooklyn was not eligible for an IEP; and (3) not offered Brooklyn an appropriate 504 plan.  At evidentiary hearings on June 16, 2021, and July 8, 2021, a total of seven witnesses testified, and the parties, represented by counsel, introduced exhibits into evidence before a hearing officer.

On August 27, 2021, the hearing officer issued her decision and order.  She concluded that the School District's kindergarten evaluation of Brooklyn was sufficiently timely and thorough to satisfy its Child Find obligations, as was its eventual issuance of a 504 plan.  She also found that Brooklyn did not meet her burden of proving IDEA eligibility under the Specific Learning Disability or Emotional Disturbance categories and that the District had provided Brooklyn with an

---

[2] The IDEA contains a two-year statute of limitations, which we have held extends to Section 504 claims regarding denial of a FAPE.  *See P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735-37 (3d Cir. 2009).

9

appropriate program and placement under the IDEA following its 2020 evaluation. However, the officer concluded that the accommodations set within the District's 504 plan for Brooklyn were too general to address adequately her social-emotional challenges, and she ordered that the District reconvene to revise her plan. She also ruled that Brooklyn was entitled to one hour of compensatory education per week during which school would have been in session from January 11, 2021—the start date of her 504 plan—until an appropriate plan was developed.

On November 23, 2021, Gabrielle filed a complaint in the United States District Court for the Eastern District of Pennsylvania. The parties agreed that discovery was unnecessary and that the matter would be decided on the administrative record, and Gabrielle moved for judgment on that record. After receiving briefs from both parties, the Court issued a memorandum opinion and order on March 3, 2023, agreeing with the hearing officer's decision in its entirety.

A notice of appeal followed.

## II.    JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 331 and 20 U.S.C. § 1514(i)(2). We have jurisdiction pursuant to 28 U.S.C. § 1291. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) ("We have jurisdiction over [the District Court's] final order [granting judgment on the administrative record] under 28 U.S.C. § 1291."). It is true that a motion for judgment on the administrative record is similar to a motion for summary judgment, and we typically do not consider a denial of summary judgment to constitute a final and

10

appealable order, but here the District Court's order dealt with all claims in the complaint and directed the clerk to close the case.

We review the District Court's findings of fact for clear error but give a fresh review of the legal standards it applied and its legal conclusions. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). "A finding of fact is clearly erroneous when, after reviewing the evidence, the court of appeals is left with a definite and firm conviction that a mistake has been committed." *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (internal quotation marks omitted).

## III.  ANALYSIS

### a.  The IDEA and Section 504 Generally

As this case deals with the relationship between these two similar, but not identical, statutes, we review the School District's obligations under each.

The IDEA furnishes federal funds to States but imposes two significant conditions on them: school districts must (1) timely identify students who need special education services and (2) provide a FAPE to those students. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). This first obligation is known as Child Find, and it places the burden on school districts, not parents, to identify children in need of

11

services.  *Id.* at 249.[3]  They must "identif[y], locate[], and evaluate[] . . . children with disabilities" who need "special education and related services."  20 U.S.C. § 1412(a)(3)(A).  Upon "notice of behavior that is likely to indicate a disability," school districts have a reasonable amount of time to evaluate "the specific problems a potentially disabled student is having[.]"  *D.K.*, 696 F.3d at 250 (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012)).  Under the IDEA, they must evaluate the child "in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(B).  However, the evaluation need not be "designed to identify and diagnose every possible disability," *D.K.*, 696 F.3d at 250, nor must it identify disabilities that are not reasonably suspected at the time.  *Cf. P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738-39 (3d Cir. 2009).

Section 504 "do[es] similar statutory work . . . by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements[.]"  *P.P.*, 585 F3d at 735.  However, it and the IDEA are not the same.  Crucially, "Section 504 defines disability more broadly than the IDEA, and thus, some students covered by Section 504 are not covered under the IDEA."  *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 269 n.4 (3d Cir. 2014).  Specifically, Section 504 defines disability to include "any mental or psychological disorder," 34 CFR §104.3(j)(2)(i)(B), whereas the IDEA lists thirteen specific categories of educational disabilities and requires that the

---

[3] Pennsylvania codifies Child Find at 22 Pa. Code §§ 14.121-14.125, which imposes screening and evaluation requirements on school districts.

student need special education and related services because of them.  20 U.S.C. § 1401(3)(A).[4]

Moreover, the IDEA explicitly provides that "[n]othing in [it] shall be construed to restrict or limit the rights, procedures, and remedies available under . . . the Rehabilitation Act or other [f]ederal laws protecting the rights of children with disabilities . . . ."  § 1415(l).  To take a step back, in 1982 the Supreme Court considered the relationship between the IDEA and other laws protecting the interests of children with disabilities.  It held that the IDEA was "the exclusive avenue" for those children to challenge the adequacy of their education.

---

[4] Section 504 covers those with *"*(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) *any mental or psychological disorder*, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities[.]"  34 CFR § 104.3(j)(2)(i) (emphasis added).  Compare to the IDEA, which covers only "child[ren] [] (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, need[] special education and related services."  20 U.S.C. § 1401(3)(A).

*Smith v. Robinson*, 468 U.S. 992, 2009 (1982).  In response, Congress passed the Handicapped Children's Protection Act of 1986, P.L. 99-372, 100 Stat. 796, which "overturned *Smith*'s preclusion of non-IDEA claims." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 161 (2017).  That Act, however, also imposed a "carefully defined exhaustion requirement"; it requires plaintiffs suing under those other laws for "relief that is also available under [the IDEA]" first to exhaust the IDEA's administrative procedures.  *Id.* (citing § 1415(l)).  That is, plaintiffs must go through a "due process hearing" before local or state administrators.  § 1415(f)(1)(A).  If they are "aggrieved by the findings and decision" of that hearing officer, they may "bring a civil action" in "any State court of competent jurisdiction or in a district court of the United States[,] without regard to the amount in controversy."  § 1415(i)(2)(A).  But beyond this requirement to exhaust, Section 504 plaintiffs retain the "rights, procedures, and remedies" otherwise available to them.  § 1415(l).

b.  The District Court's Decision

Though the language of § 1415(l) cautions against treating Section 504 claims as subsumed within IDEA claims and thereby resolved by their disposition, the District Court did just that.  After analyzing Brooklyn's Child Find claim under the IDEA, it relegated its analysis under Section 504 to a footnote.  Noting that her family argued that the hearing officer "erroneously conflat[ed]" the requirements of the two claims, the Court proceeded to repeat the error.  App. at 21 n.15 (internal quotation marks omitted).  It acknowledged that "the reach of Section 504 is broader than that of the IDEA," but nonetheless held that a separate Section 504 analysis was "unnecessary" because "[w]hen a  party makes claims under Section 504 that are 'parallel' to IDEA claims, '*i.e.*, because

14

both claims concern the District's alleged FAPE denial, resolution of the IDEA issue will also resolve the Rehabilitation Act issue." *Id.* (citations omitted).  As the Child Find claims were "parallel to one another because both concern the same conduct by the [School] District in allegedly denying a FAPE to Brooklyn[,]" no separate analysis was necessary. *Id.*  Alternatively, the Court noted in one sentence that even if a separate analysis were necessary, it would find the District had "discharged its obligations" by "timely evaluat[ing]" Brooklyn in a "thorough manner," as already addressed in its IDEA analysis. *Id.*

The same conduct can, of course, serve as the basis for IDEA and Section 504 claims.  But that doesn't avoid the need to perform a Section 504 analysis.  As noted above, Section 504 covers more students than does the IDEA, including students who are merely perceived as disabled.  28 C.F.R. § 35.108(a)(1)(iii).  A student could be covered under one statute but not the other, and courts in our Circuit have found this to be the case. *See also Lauren G. ex rel. Scott G. v. West Chester Area Sch. Dist.*, 906 F. Supp. 2d 375 (E.D. Pa. 2012) (holding that a school district violated Section 504 for periods of a child's education when it did not violate the IDEA).[5]  Indeed,

---

[5] In other respects, Section 504 imposes fewer demands on school districts than does the IDEA, notably imposing less rigorous notice and consent requirements, as well as not specifically requiring a written educational plan like an IEP.  And some Section 504 claims require proof of elements the IDEA does not; notably, intentional discrimination claims require proof of deliberate indifference to recover compensatory damages. *See D.E. v. Cent. Dauphin Sch. Dist.*,

Brooklyn's educational history is a case in point; from kindergarten through second grade, she received special education services under the IDEA, and from fourth grade on, she received them under Section 504. Her claims under both laws are plainly different—their timing alone reveals that.

Moreover, the differences in the statutes' definitions of disability—particularly which emotional issues they encompass—are central to the family's argument. For that reason, the School District's reliance on *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126 (3d Cir. 2022), is misplaced. In *J.M.*, the School District points out, we found that plaintiffs did "not present[] any evidence unique to th[e Section 504] claim . . . . [T]hey assert[ed] a § 504 cause of action purely as a companion to their denial-of-FAPE claim." *Id.* at 146. Thus, we held that it was "not necessary to analyze whether the § 504 claim m[ight have been] brought as a companion to the denial-of-FAPE claim . . . because [the student]'s parents d[id] not succeed on their denial-of-FAPE claim, *and they offer[ed] no additional evidence* in support of their § 504 claim." *Id.* at 147 (emphasis added). But we noted as well that "the statutes differ in important respects," including the scope of disability, though "*[d]epending on the factual basis for a denial-of-FAPE claim*, the legal differences . . . may be of no moment." *Id.* at 146-47 (emphasis added). In *J.M.*—where the student's Section 504 argument consisted merely of six lines in his opening brief asserting that because the school district denied him a FAPE under the IDEA, it denied him one under Section 504—those differences indeed were of no moment. Here— where the crux of Brooklyn's argument hinges on the School

_____

765 F.3d 260, 269 (3d Cir. 2014) (citing *S.H. v. Lower Merion Sch. Dist.,* 729 F.3d 248, 261, 263 (3d Cir. 2013)).

District repeatedly refusing to perform a comprehensive evaluation that might have detected a Section 504-eligible disability at a much earlier date—is an instance where they are.

\*    \*    \*    \*    \*

While there is significant debate about when the School District was put on notice of Brooklyn's emotional struggles, her family contends they introduced sufficient evidence to show that it should have reasonably suspected her of qualifying as disabled under Section 504 earlier than it did, meaning it erred in refusing to conduct the comprehensive evaluation the family repeatedly requested. We cannot resolve this factual question. The trial court needs to conduct this analysis and determine whether the School District violated its Child Find obligations under Section 504.[6] We therefore vacate the grant of judgment on the administrative record for the School District and remand to perform this analysis.

---

[6] To the extent the District Court, in its review of the hearing officer's decision as to Brooklyn's Section 504 claim, will need to make factual determinations based on the administrative record, we note that "the Supreme Court has required district courts to apply modified *de novo* review only in their review of IDEA claims . . . , and we decline to extend that review to claims under the ADA and Section 504[.]" *Le Pape v. Lower Merion Sch. Dist*, No. 22-2931, op. at 11 (3d Cir. June 4, 2024) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)).